**WINDSOR INDUSTRIES, INC., Plaintiff,**

v.

**EACA INTERNATIONAL LTD. and E&P Electronics (HK) Ltd., Defendants.**

**No. 77 CV 1187 (ERN).**

United States District Court,
E. D. New York.

Oct. 5, 1982.

Noel W. Hauser, P. C., New York City, for plaintiff.

Maurice H. Bitner, P. C., Parsippany, N. J., for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiff Windsor Industries, Inc. ("Windsor"), a New York corporation, brought this action against defendants EACA International Ltd. ("EACA") and E. & P. Electronics (HK) Ltd. ("E&P") to recover damages in the sum of $275,000 for alleged breach of warranties by defendants in their sale of electronic TV games to Windsor. EACA and E&P are foreign corporations organized under the laws of the Crown Colony of Hong Kong, and have appeared herein, with EACA asserting a counterclaim against Windsor for nonpayment for goods sold and delivered by EACA in the amount of $68,-600. This Court's jurisdiction is grounded upon the parties' diverse citizenship.

The action was tried on the facts without a jury. After hearing the testimony of the parties and examining their exhibits and briefs, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Windsor is a New York corporation having its principal place of business in Melville, Suffolk County, New York. It has been engaged for many years in the importation of consumer electronic products from the Far East, *e.g.*, Hong Kong, Japan, Taiwan, Philippines and Singapore, and their resale to customer retail outlets throughout the United States. Windsor has 27 employees and its annual volume of business is $15,000,000.

2. EACA was originally organized in Hong Kong in 1970 as a sole-proprietorship by Eric Chung, a mechanical engineer formerly in charge of production for Fairchild Semi-conductor, an American company in Kowloon, which manufactured transistors, diodes and integrated circuits, the latter commonly known as "ICs" or "chips." After originally engaging in the purchase and sale of electronic components such as transistors and diodes, EACA was reorganized as a corporation and began in 1973 to manufacture digital clocks and by 1975 had 90 employees and a business volume of US $1,000,000.

3. E&P was organized in March 1976 as a separate venture of Eric Chung and Paul Yang, a United States citizen residing in Pasadena, California. DX R.[1] Their purpose was to develop and market a TV game. After seven months of research by a staff of ten engineers and the expenditure of US $200,000, a TV game was devised which satisfied the United States Federal Communications Commission's ("FCC") regulation regarding radiation.

4. A TV game is an audio electronic device which, when connected to a standard television receiver, reflects a simulated playing area on the TV screen and provides

1. Plaintiff's and defendants' exhibits are designated as "PX" and "DX".

a means of controlling movement of a reflected point of light on the playing area representing a ball or puck as in a game of ping pong, tennis, squash or hockey.

5. Windsor's vice-president of sales, Milton Hiller, was the corporate officer responsible for purchasing consumer electronic products overseas. In May 1976, while on a buying trip to Hong Kong, Hiller was introduced to Eric Chung by one of Windsor's suppliers to discuss a purchase of TV games. Following that discussion, during which Hiller was shown a mock-up model submitted to the FCC and made an inspection of the E&P manufacturing facilities, Hiller placed an "opening order" dated May 6, 1976, for 10,000 EP–460 TV game sets at US $27 per set for a total price of $270,000. Payment was to be made by irrevocable letter of credit in favor of E&P and shipment was to be made in July and August 1976 by air. PX 1.

6. After Hiller's return to the United States, Windsor placed another order with E&P on August 3, 1976, calling for an additional 15,000 TV game sets to be shipped by air in September and October 1976, the total price of US $405,000 to be paid by irrevocable letter of credit. DX C.

7. Prior to shipment, and as a condition to E&P obtaining payment under the letter of credit, as amended from time to time, the TV games had to pass final inspection by Issei Kotaka and be accepted by him on behalf of Windsor. Tr. 276; 148. Kotaka, also an engineer, was one of Windsor's representatives in the Far East and manager and shareholder of Tamarac Industries, Ltd., in Hong Kong, of which Hiller and David Fink, son of Windsor's president, were co-shareholders. DX W; Tr. 47–49, 67, 79.

8. Pursuant to Windsor's orders, E&P commenced shipping the TV games to New York in quantity on September 29, 1976, as certified and inspected by Kotaka, and at brief intervals thereafter. As of December 15, 1976, 25,000 sets had been shipped, for which Windsor paid a total purchase price of US $708,099.90 by letters of credit. DX F. All of these shipments were made by air

freight and arrived in timely fashion in the United States a week after each shipment left Hong Kong, since they were intended for the Christmas buying season. Tr. 16, 93–94, 99. DX F.

9. Windsor made no further inspection of the TV games upon their arrival in the United States, the merchandise being transshipped from airport terminals directly to Windsor's retail customers who had previously placed orders based on samples and pictures. Tr. 15–16, 21, 22–23, 93.

10. In mid-December 1976 Hiller met again with Chung in Hong Kong and placed orders for additional TV games to be shipped to Windsor as soon as possible. Chung informed Hiller that he and Paul Yang were splitting up and that on and after January 1, 1977, Chung's company, EACA International, would take over the E&P production facilities for the manufacture of TV games in addition to EACA's regular line of digital clocks. Since Yang was to receive money for his share of the business, Windsor at Chung's request opened on December 17, 1976, a new irrevocable letter of credit, No. 965625, in favor of "Paul Yang Associates Inc." in the amount of US $133,125 to cover 5,000 TV games to be shipped to Windsor by air. DX E. On December 29, 1976, 3,000 TV games were shipped to Windsor by Yang pursuant to the aforesaid letter of credit. DX F. The value of the shipment was US $79,875, leaving an undrawn balance on the letter of credit of US $53,250. DX F. No further shipments were attributed to Yang.

11. Windsor's other orders to Chung placed during December 1976 were shipped and apparently paid for pursuant to another letter of credit, No. 965633, in favor of "Karter Appliance Company." DX F. This covered two shipments attributed to Karter totaling 3,000 TV games of an aggregate value of $72,000, which were forwarded to Windsor by air on December 25, 1976. DX F, G, H.

12. In early January 1977 Hiller and Chung met in Chicago at a trade show and discussed future business, pricing and delivery, and an appointment was made for

Chung to visit Windsor's warehouse facility in New York. Tr. 23–24. At that time Windsor placed an order with Karter Appliance Company, as exporter, for 3,000 TV games at US $22.50 per set for a total price of US $67,500. DX V. Shipment was made by ocean carrier from Hong Kong to Los Angeles on January 13, 1977, upon a guarantee of payment by Tamarac Industries Ltd. "as Windsor Industries, Inc.," since a letter of credit was to be provided "at a later stage." DX V. Under the ocean bill of lading the goods were consigned to the order of Citibank in New York, with notification to Windsor upon arrival, which was expected to be on January 29, 1977. DX V, X. This shipment was delivered to Windsor but not paid for according to the terms of the guaranty.

13. On January 11, 1977, Chung, accompanied by his engineer, visited Windsor's office in Melville, Long Island, bringing with him 100 pieces of each of three spare parts for the TV games as requested by Hiller. DX T, U; Tr. 323. Chung testified to separate discussions he had with Hiller and later with Morris Fink, Windsor's president, which took up the entire day except for a brief tour of Windsor's facilities. Fink did not testify at trial; Hiller and Michael Wong, a technician in Windsor's employ, were the only witnesses. Their testimony regarding those discussions is in sharp conflict with that of Chung and raises serious issues of credibility hereinafter discussed.

14. Immediately after Chung's return to Hong Kong, Windsor, acting through Tamarac Industries Ltd., placed a further order for 3,430 TV games at the lower price of US $20.00 per set, totaling US $68,600. DX W. This was the first order placed with defendant EACA as such, and, as in the previous order, payment was guaranteed by Tamarac "as Windsor Industries, Inc." pending issuance of a letter of credit "at a later stage." DX I, W. This shipment went forward by ocean carrier on January 20, 1977, consigned to Citibank in New York, with notification to Windsor on arrival. DX W. Windsor refused to accept and pay for the shipment when it arrived

during February 1977. DX X; Hiller Affidavit, May 31, 1977, ¶ 8.

## DISCUSSION

■ The first question is what law applies to this controversy? Plaintiff, relying on the New York Uniform Commercial Code, § 1–105(1), urges that New York law should govern since delivery was made in New York and it was understood that the TV games were to be resold and distributed through plaintiff's facilities here. The facts of the transactions, however, do not support the application of New York law. They clearly indicate that the negotiations for the transactions occurred in Hong Kong; that Windsor's orders for the goods were accepted there; that the TV games were delivered to Windsor's agent in Hong Kong, were accepted by him there after inspection and shipped F.O.B. Hong Kong aboard carriers he designated; and that payment was made to the seller by means of irrevocable letters of credit established at Citibank in Hong Kong, except for the last shipment which is the subject of defendant EACA's counterclaim. Accordingly, the Court concludes that whether the "grouping of contacts" or the "center of gravity" test is applied, the appropriate law is that of Hong Kong.

The law of Hong Kong relating to the parties' transactions is found in its Sale of Goods Ordinance. Laws of Hong Kong, Chapter 26, Rev. Ed. 1977. DX AA. The pertinent section provides:

"16. (1) Except as provided by this section, and section 17, and subject to the provisions of any other enactment, there is no implied condition or warranty as to the quality of fitness for any particular purpose of goods supplied under a contract of sale.

(2) Where the seller sells goods in the course of a business, there is an implied condition that the goods supplied under the contract are of merchantable quality, except that there is no such condition—

(a) as regards defects specifically drawn to the buyer's attention before the contract is made; or

(b) if the buyer examines the goods before the contract is made, as regards defects which that examination ought to reveal.

(3) Where the seller sells goods in the course of a business and the buyer, expressly or by implication, makes known to the seller any particular purpose for which the goods are being bought, there is an implied condition that the goods supplied under the contract are reasonably fit for that purpose, whether or not that is a purpose for which such goods are commonly supplied, except where the circumstances show that the buyer does not rely, or that it is unreasonable for him to rely, on the seller's skill or judgment."

■ In view of Windsor's contention that it purchased the TV games on the basis of a sample, section 17 of the Sale of Goods Ordinance must also be noted. That section provides:

"17. (1) A contract of sale is a contract for sale by sample where there is a term in the contract, express or implied, to that effect.

(2) In the case of a contract for sale by sample—

(a) there is an implied condition that the bulk shall correspond with the sample in quality;

(b) there is an implied condition that the buyer shall have a reasonable opportunity of comparing the bulk with the sample;

(c) there is an implied condition that the goods shall be free from any defect, rendering them unmerchantable, which would not be apparent on reasonable examination of the sample."

Windsor's evidence of a sale by sample would not satisfy the plain language of section 17. The "sample" relied on was not a finished product but only a mock-up exhibited to Hiller, to show what had been submitted to the FCC in connection with a filing for FCC approval in respect of radiation safeguards. This was prior to defendants' actual manufacture of the TV games and clearly not intended to be an exemplar of the finished product or an "implied con-

dition that the bulk shall correspond with the sample in quality." *Id.* Thus there was no sale by sample.

Returning now to section 16, it is plain that subparagraph (3) is not germane to the transactions here in question. Windsor did not buy the TV games for any other particular purpose than that made known by defendants, *i.e.,* an electronic game to be used in conjunction with a television set. Thus there is no occasion for implying any warranty that the goods were reasonably fit for any other purpose.

■ Defendants, citing an array of British legal precedents, contend that section 16 must be construed to eliminate any implied condition or warranty even of merchantable quality in the circumstances of this case. Hong Kong is still a British Colony and British law is applicable. And under Rule 44.1, F.R.Civ.P., the Court in determining foreign law "may consider any relevant material or source . . . ."

The British cases quoted by defendants in their brief, as they acknowledge, turn on the question of whether the purchaser relied on the seller as to the condition of the goods. If he did, there is a warranty; if he did not, no warranty arises. Section 16, *supra,* provides that where goods are sold "in the course of a business" there is an implied warranty "of merchantable quality." But no such warranty arises "if the buyer examines the goods before the contract is made, *as regards defects which that examination ought to reveal."* (Emphasis supplied.)

Whether the TV games involved were not of merchantable quality, or contained defects which examination would not reveal, and whether the substantial number of games returned by Windsor's customers was attributable to defects in manufacture and not some other reason, are questions which cannot be answered without reference to the credibility of testimony.

Plaintiff's witnesses were Milton Hiller, Windsor's vice-president of sales, and Michael Wong, a technician in charge of its repair shop. Hiller's testimony made it

clear that Windsor was no novice in the Far East; and that in pursuit of its business as an importer of consumer electronic products, Hiller visited Hong Kong and other principal commercial centers in the Far East two or three times a year to place orders. It seems equally clear that in 1976 Windsor was interested in adding TV games to its line and sought out Eric Chung, defendants' principal, who was then about to embark on what for him and Windsor was an entirely new product. This was certainly not concealed from Hiller, since he placed Windsor's initial order on the basis of a mock-up sample and Chung's description of the components. Indeed, Hiller testified that "the item was a new item, a new venture into this game." Tr. 16. Nor does the Court doubt that, as Hiller also testified, Chung said he would repair or replace any game that was in fact defective. Tr. 8, and see DX X.

As alleged in the complaint, Windsor's claim to recover damages of US $275,000 is based on the assertion that defendants refused to repair or replace over 8,000 "defective and unusable" TV games returned for credit by customers. This, if true, would have been a return rate of over 30%, since approximately 25,000 sets had been placed with customers by the end of December 1976. Tr. 23. Hiller also testified that 90% of the merchandise had to be liquidated at "[t]en cents on the dollar." Tr. 43.

The credibility of such claims is placed in serious question, however, by information disclosed in Windsor's own records, and by the incredible deposition testimony of a former sales executive of Lafayette Radio & Electronics which was offered by plaintiff. Lafayette was a major customer of Windsor and the largest purchaser of the TV games. Until about January 10, 1977, Morton J. Gleberman was Lafayette's vice-president for purchasing. He testified on his deposition that Lafayette began distribution of the games to its retail accounts in late October or early November 1976; that "[e]verything we sold came back"; and that he ordered return of all the goods to Windsor immediately.

Although Gleberman said he received about half the 20,000 units he had ordered, Windsor's invoices to Lafayette reflect the delivery of 20,310 games to Lafayette, the last 3,000 units being delivered on January 10, 1977, the date Gleberman said he left Lafayette's employ, and despite his testimony that all outstanding orders had been cancelled. PX 3. Also, according to Windsor's records, Lafayette returned as of March 30, 1977 a total of 3,361 games. PX 5. The major portion, 2,268 games, were returned in January, raising a doubt as to whether these were in fact defective or simply leftover stock which Windsor agreed to take back from its major customer. That doubt gains support from the fact that Windsor sold 17 TV games to Lafayette in April 1977—not at 10 cents on the dollar as Hiller testified—but at the original US $36.50 price. PX 3.

Windsor's records of sales to other customers and the number of games returned raise further doubts as to the extent of Windsor's claimed losses from allegedly defective games. The distribution of all the TV games that Windsor actually received from defendants and paid for was as follows:

| Customer | Sales | Returns |
|---|---|---|
| Lafayette | 20,310 | 3,361 |
| Skaggs | 3,464 | 188 |
| Nichols | 2,016 | 382 |
| Alexander's | 1,998 | 310 |
| Gold Circle | 480 | 39 |
| All others | 1,728 | 154 |
| Total | 29,996 | 4,434 |

(PX 3, 5.)

The parties agree that Windsor received 31,000 games paid for by letters of credit and shipped in 1976. DX F. Assuming that 1,004 games (the difference between 31,000 and 29,996) paid for were not distributed to customers, there is no credible evidence that they were in fact defective, and no reason for so concluding in view of the substantial preponderance of games that were *not* returned to Windsor.

The testimony of Michael Wong, Windsor's repair technician, did little to over-

come the doubts raised by plaintiff's evidence. His claim that he examined 10,000 of the games and found "the large chip was no good" in half of them does not jibe with the number of returns shown in Windsor's records. PX 3. Nor does his claim of other defects in the games correspond with Hiller's telex request to Eric Chung to bring with him a small number of "spare parts" when Chung came on a visit to Windsor's facility in mid-January 1977. DX T, U.

Chung, as defendants' principal, was of course also an interested witness. The Court finds his testimony corroborated, however, by contemporary communications between the parties and a more credible account of events. There is no question that Windsor placed new orders on January 6 and 13, 1977, calling for shipment respectively of 3,000 TV games by ocean carrier to Los Angeles, and 3,430 games to New York, also by ocean carrier. DX V, W. These were at reduced prices of US $22.50 and $20.00 per set pursuant to conversations Chung had with Hiller early in January at the trade show in Chicago, and on January 12 when Chung visited Windsor's facility on Long Island. Before placing those orders both Hiller and Fink, Windsor's president, were aware that quantities of games were being returned by retail customers. If the claimed defects had been as critical as they testified, Windsor certainly had time to cancel the additional shipments before they departed Hong Kong on January 13 and January 20, 1977. DX V, W. Indeed, it appears that Chung was in Windsor's office on January 11. DX T.

Chung acknowledged in his testimony that Fink complained at their meeting of some defects in the games but without specification and there is no question that Windsor advised Chung that 3,000 "defective" games were to be shipped back to Hong Kong on February 17 aboard a Zim vessel. DX P, PX 6. Subsequent telex correspondence reflects that Windsor, after delaying the transmittal of shipping documents, requested Chung to accept the return on a "collect" basis, which he apparently refused. DX N, Z, M, O. In the interim the last two shipments Windsor ordered arrived in Los Angeles and New York. Windsor obtained possession of the Los Angeles shipment of 3,000 games, sold in the name of Karter Appliance Company, with E&P designated as the manufacturer. DX V. Payment for that shipment was never made by Windsor, despite its guarantee to do so. The New York shipment made by EACA was refused by Windsor when it arrived in February 1977, also despite its guaranty to pay for it.

Since Karter Appliance Company is not a party to this action, the only questions before this Court are (1) whether Windsor has met its burden of proving by a fair preponderance of credible evidence that the TV games shipped by defendants were not of merchantable quality; and (2) whether EACA is entitled to recover $68,600 for the last shipment which Windsor refused to accept on its arrival in New York.

## CONCLUSIONS OF LAW

■ 1. The law applicable to this action is that of Hong Kong as expressed in its Sale of Goods Ordinance. Pursuant to section 16(2) of that law, there was an implied warranty that the goods supplied by defendants were of merchantable quality.

■ 2. Plaintiff has failed to establish by credible evidence that there was a breach of that warranty on the part of either defendant named herein.

■ 3. Defendant EACA has established by a preponderance of credible evidence that plaintiff Windsor wrongfully refused to pay the sum of US $68,600, the price of goods to which it had obtained title pursuant to sale F.O.B. Hong Kong.

4. Defendant EACA is entitled to judgment against Windsor in the sum of US $68,600 with interest from February 20, 1977, and costs, but with credit to Windsor for the amount of attachment proceeds held by the United States Marshal less any fees due.

The parties are directed to settle the form of judgment within fifteen (15) days from the date hereof.

SO ORDERED.