## In re FLIGHT TRANSPORTATION CORPORATION SECURITIES LITIGATION.

**Russell T. LUND, Jr., et al.**

v.

## FLIGHT TRANSPORTATION CORPORATION, et al.

**Master No. 4–82–874.**
**File No. 4–82–1578.**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 21, 1985.

Ted S. Meikle, Fredrikson and Byron, Minneapolis, Minn., for plaintiff Russell T. Lund, Jr.

Duane W. Krohnke, Faegre and Benson, Minneapolis, Minn., for defendant Norwest Bank.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.[1]

On December 2, 1982, plaintiff, Russell T. Lund, Jr. ("Lund"), filed a complaint against American National Bank ("American National") alleging, *inter alia*, a conversion claim for payment of a check over a forged endorsement. [Record Relating to Claim of Plaintiff Russell T. Lund, Jr. Against Defendant Norwest Bank Minneapolis, N.A. With Respect to Allegedly Wrongfully Cleared Check, Tab 1][2]. The parties thereafter reached an agreement whereby American National assigned to Lund a claim for indemnity against Northwestern National Bank of Minneapolis ("Norwest") based upon Norwest's alleged breach of warranties created under the Uniform Commercial Code running in favor of American National. [Tab 19]. On December 27, 1982, Lund filed his First Amended Complaint for Declaratory Relief against Norwest, including, as Count VIII, a claim for conversion on the check and the indemnity claim assigned from American National.[3] With the exception of Count VIII, all counts of the First Amended Complaint have been either dismissed or resolved.

Lund proceeded against Norwest on Count VIII of the complaint, asserting the indemnity claim only, by filing a motion for summary judgment upon which the court heard oral argument on March 13, 1985.[4] On August 28, 1985, a bench trial was held on this claim. In addition to hearing the testimony of plaintiff, the court also has before it numerous depositions and documentary exhibits.

Plaintiff Lund was a co-founder, outside director, shareholder, and officer of the Flight Transportation Corporation ("FTC", originally known as the Flight Training Center). Subsequent to the company's formation, William Rubin ("Rubin") became a shareholder, director, and the president of FTC. Lund and Rubin purchased a Learjet (the "Learjet 25") in June 1978 and leased it to FTC. Their purchase was financed by American National. In December 1978, the jet was destroyed in a crash at the Minneapolis-St. Paul International Airport. The hull insurance proceeds were paid to American National, which applied them to pay off the balance due it on the financing. On February 6, 1979, American National issued a cashier's check, No. C20141, payable to the order of Rubin and Lund in the

---

1. Judge Weiner, a district judge in the Eastern District of Pennsylvania, is sitting by designation.

2. All subsequent references to this record will simply refer to the Tab number.

3. In the Separate Answer of defendant American National Bank & Trust Company of St. Paul dated February 20, 1985 filed in response to Lund's First Amended Complaint, American National appears to deny that it assigned its indemnity claim to Lund. [Tab 5 at ¶ 5]. However, after reviewing the deposition of William S. Fallon, Vice-President and General Counsel of American National, and the exhibits attached thereto, the court is satisfied that such an assignment, in fact, occurred.

4. Norwest also filed a motion for summary judgment on this claim. While the court did not enter an order on this motion, the court orally informed the parties that it was denying their motion due to the presence of material issues of fact.

amount of $342,634.69 [Plaintiff's Exhibit A]. This amount represented the excess of the insurance proceeds over the loan balance of the plane.

Lund claims that he never learned of the check's existence until some time after the Securities and Exchange Commission initiated proceedings against Rubin and FTC on June 18, 1982. The check, however, was deposited into a joint account that Lund and Rubin maintained at the Fifth Northwestern National Bank of Minneapolis ("Fifth Northwestern"). Norwest accepted the check as a collecting bank. Norwest transferred the check by its endorsement and received payment for it from American National. On the back of the check are endorsements which purport to be the signatures of Rubin and Lund. Lund claims that his signature was forged. Norwest does not deny that the signature on the check is not Lund's.

Lund asserts that Norwest is liable by the following reasoning: First, American National is liable to Lund for conversion under Minn.Stat. § 336.3–419(1)(c) [5] as a result of paying the check over a forged endorsement. Second, citing Minn.Stat. § 336.3–116(b) [6] Lund claims that Norwest had no right to obtain payment from American National because he did not endorse the check. Third, citing Minn.Stat. § 336.-3–417(1),[7] Lund claims that because American National paid the check in good faith and because Norwest obtained payment from American National, Norwest warranted to American National that it had good title to the check. Of course, Lund asserts that Norwest did not have good title because his signature was forged. Thus, Norwest is allegedly liable to Lund because Lund, by virtue of the assignment, can assert American National's claim against Norwest.

Norwest contends that Lund and Rubin were partners engaged in the purchase, lease, and sale of aircraft. Its principle defense, therefore, relying on Minn.Stat. § 336.3–110(1)(g), is that Rubin was authorized to endorse the check on behalf of the partnership.[8] Lund denies that a partnership relationship existed. Alternatively, Lund maintains that even if a partnership existed, Norwest's defense is based on the unfounded assumptions that Rubin forged Lund's signature and used the proceeds of the check for the benefit of the partnership.

Between 1978 and 1982, Lund and Rubin purchased six airplanes. The account that Lund and Rubin maintained at Fifth Northwestern was opened in July, 1978, shortly after their first purchase of an airplane. The account, known as "the R & L Jet Account," was an "operational account" used to facilitate transactions involving the planes they owned and leased to FTC. Lease payments from FTC were deposited into the account and checks were drawn on the account to pay for expenses related to the planes.

Lund testified that as a result of his ownership and leasing of the airplanes, he expected to realize benefits on his personal income tax returns through investment tax credits and loss deductions. Due to the provisions of the tax code and the desire to provide the aircraft to FTC on beneficial terms, it appears that Lund expected to operate the planes at a loss. [Tab 26 at p. 317]. Lund stated that most of the time, he and Rubin would share any losses fifty-fifty. [*Id.* at 318]. While Lund and Rubin generally intended to contribute equal

---

**5.** Minn.Stat. § 336.3–419(1)(c) provides that:
(1) An instrument is converted when
  (c) it is paid on a forged indorsement.

**6.** Minn.Stat. § 336.3–116(b) provides that:
An instrument payable to the order of two or more persons
  (b) if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them.

**7.** Minn.Stat. § 336.3–417(1)(a) provides:

(1) Any person who obtains payment or acceptance and any prior transferor, warrants to a person who in good faith pays or accepts that
  (a) he has a good title to the instrument ...

**8.** Minn.Stat. § 336.3–110(1)(g) provides that an instrument may be payable to the order of:
  (g) a partnership or unincorporated association, in which case it is payable to the partnership or association and may be indorsed or transferred by any person thereto authorized.

shares of capital necessary for the purchase and operation of the airplanes, Lund possessed greater financial resources than Rubin and sometimes contributed a greater than fifty percent share toward given transactions. [*Id.* at 315–317].

Lund testified that he and Rubin owned the Learjet 25 which crashed as co-owners, not as partners. He stated that this form of ownership was deliberately chosen because he thought that co-ownership, as opposed to partnership, would maximize his tax benefits. He also noted that his prior experience with partnership ventures left him uncomfortable with that kind of arrangement. The FAA Aircraft Registration Application has a section entitled "Type of Registration." The five types listed are: (1) individual; (2) partnership; (3) corporation; (4) co-owner; and (5) government. Rubin prepared the form for the Learjet 25 and checked off the box next to co-owner. [Tab 33].

The details regarding the purchase and operations of the airplanes were handled by Rubin. Rubin kept all books and records relating to the airplanes. Rubin kept the check ledger of the Fifth Northwestern account and drew all checks written on the account. Rubin, alone, had access to the post office box in St. Louis Park, Minnesota to which statements from the Fifth Northwestern account were sent. Rubin made the lease payments from FTC and deposited them in the Fifth account. Rubin handled the arrangements regarding the insurance of the aircraft. Listed as an additional insured on the policy covering the Learjet 25 (Flight Training Center, Inc. was the named insured) is "R & L Investments, a partnership, William Rubin and Russell T. Lund, Jr." [Tab 35]. The address given for R & L Investments is the same address to which the bank statements from the Fifth account were sent.

Although Lund had a right to inspect the books and records relating to the airplanes, he never requested to do so. Lund testified that he could have requested access to the St. Louis Park post office box, but didn't feel that it was necessary. He never examined any statements from the Fifth account. While he made some deposits into the account, he never drew any checks on it.

The Uniform Partnership Act, adopted by Minnesota, Minn.Stat. §§ 323.01 *et seq.* defines a partnership as "as association of two or more persons to carry on as coowners a business for profit." Minn.Stat. § 323.02 subd 8. Lund acknowledges that an essential element of a partnership, that of coownership, is present in the case *sub judice.* However, citing to the less favorable tax treatment which a partnership would have received, Lund claims that he and Rubin never intended to form a partnership.

The court will not look to the Internal Revenue Code, or the plaintiff's understanding of it, as a source of partnership law. More appropriate is the Official Comment to the Uniform Partnership Act section which defines a partnership. It states, in part, that:

> The definition [of a partnership] asserts that the associates are "co-owners" of the business. This distinguishes a partnership from an agency—an association of principal and agent. A business is a series of acts directed toward an end. Ownership involves the power of ultimate control. To state that partners are co-owners of a business is to state that they each have the power of ultimate control.

> Lastly, the definition asserts that the business is for profit. Partnership is a branch of our commercial law; it has developed in connection with a particular business association, and it is, therefore, essential that the operation of the act should be confined to associations organized for profit.

6 U.L.A. 23 (1969). The partnership statute itself also provides several guidelines for determining whether a partnership exists. Minn.Stat. § 323.06. One factor to be considered is that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." Minn.Stat. § 323.06(4).

Applying these considerations to the evidence presented, the court concludes that Lund and Rubin combined their efforts and property to carry on as co-owners a business for profit. First, the element of co-ownership is undisputed. Second, Lund and Rubin engaged "in a series of acts directed toward an end." That is, they purchased six airplanes together and carried out the steps necessary for their leasing and operation with the aim of realizing benefits on their personal income tax returns.[9] Third, each contributed something to the venture and they agreed upon how the benefits derived therefrom were to be divided. The partnership statute requires no more than this in order to establish the existence of a partnership.[10]

Lund contends, however, that the bank's partnership defense cannot stand because there is no evidence that Rubin forged Lund's endorsement. Lund has not challenged the authenticity of Rubin's signature. The Official Comment to § 3–110 of the Uniform Commercial Code provides that "any person having authority from the partnership or association to whose order the instrument is payable may endorse or otherwise deal with the instrument." Since the authenticity of Rubin's signature has not been challenged and since Rubin, as a partner, had the authority to endorse the check on behalf of the partnership, the identity of the party who signed Lund's name to the check is of no consequence.

Lund further maintains that Rubin's endorsement was unauthorized because the proceeds of the check were not used in furtherance of partnership business. Relying on Minn.Stat. § 323.08,[11] Lund notes that the existence of the check was hidden from him by Rubin for over two years. Rubin, however, had the authority to endorse the check and he deposited it in an account maintained by the partnership for the transaction of partnership business. The deposit of a check, issued pursuant to partnership business, into a partnership account, is indicative of carrying on the partnership business in the usual way. That Rubin subsequently used the proceeds for himself should not serve to impose liability on Norwest who was without reason to suspect Rubin's dishonesty. Furthermore, it was only through Lund's acquiescence in Rubin's handling of the details of the partnership that Lund failed to discover the check. Accordingly, the court finds that Norwest has maintained a valid partnership defense.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the above Memorandum Opinion constitutes this court's findings of fact and conclusions of law.

## ORDER

The court finds in favor of the defendant, Norwest Bank Minneapolis, N.A. and against the plaintiff, Russell T. Lund, Jr.

---

**9.** An affidavit filed by Lund states that, "the arrangements for each plane were worked out separately from the other planes, each as an individual transaction." [Exhibit A, Rebuttal Memorandum in Support of Motion for Summary Judgment]. Accordingly, he asserts that the other planes they purchased together have "no relevance to the nature of their ownership of the Learjet that crashed." [Rebuttal Memorandum at 5]. However, even if the purchase of each plane is viewed as a discrete transaction, it does not negate the view that the transactions were a series of acts directed toward making a profit. Moreover, even if the court focused solely on the plane that crashed, the plane was purchased, leased, and operated in order to confer a benefit to Lund and Rubin and they were required to perform a series of acts before any benefits could be realized.

**10.** Although the "benefits" derived from the business venture were not in the form of profits,

but in the form of losses which had favorable tax consequences, the court construes Minn. Stat. § 323.06(4) as broad enough to encompass the splitting of losses as well as the splitting of profits. Furthermore, we note that Rubin's handling of the details of the many transactions involving the airplanes does not preclude the finding of a partnership. It is well settled that a partnership may be found where one party contributes services and another party contributes capital, so long as there is a splitting of the profits between them. *Cyrus v. Cyrus*, 242 Minn. 180, 64 N.W.2d 538 (1954).

**11.** Minn.Stat. § 323.08 provides, in pertinent part, that:

An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

Judgment is entered in favor of the defendant and against the plaintiff.

IT IS SO ORDERED.