**LUND'S, INC. and Wardwell M. Montgomery, Plaintiffs–Cross–Appellees,**

**Russell T. Lund, Jr.,
Plaintiff–Appellant,**

**v.**

**CHEMICAL BANK,
Defendant–Cross–Appellant–Appellee.**

**CHEMICAL BANK, Defendant and
Third–Party Plaintiff,**

**v.**

**LAIDLAW ADAMS & PECK INC.,
Third–Party Defendant–Appellant.**

Nos. 976, 1109, 1111, Dockets 87–7605, 87–7607, 87–7625.

United States Court of Appeals,
Second Circuit.

Argued April 26, 1988.

Decided March 16, 1989.

Jonathan C. Thau, New York City (Maura E. Mahon, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, of counsel), for third-party defendant-appellant Laidlaw Adams & Peck Inc.

Eileen Berkman, New York City (Barbara E. Daniele, New York City, of counsel), for defendant-cross-appellant-appellee and third-party plaintiff Chemical Bank.

Jerome B. Pederson, Minneapolis, Minn. (Ted. S. Meikle, Fredrikson & Byron, Minneapolis, Minnesota, Richard L. Bond, James R. Kahn, Dorsey & Whitney, New York City, of counsel), for plaintiff-cross-appellee Lund's, Inc. and plaintiff-appellant Russell T. Lund, Jr.

Stephen G. Rinehart, New York City (Parker Chapin Flattau & Klimpl, New York, New York, of counsel), for plaintiff-cross-appellee Wardwell M. Montgomery.

Before CARDAMONE, PRATT and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

We consider here appeals and a cross-appeal from summary judgments entered in the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge*, for plaintiffs-cross-appellees Lund's, Inc. and Wardwell M. Montgomery ("Montgomery") against defendant-cross-appellant-appellee and third-party plaintiff Chemical Bank ("Chemical"), and for Chemical against plaintiff-appellant Russell T. Lund, Jr. ("Lund").[1] Judgment was also entered for Chemical for indemnification against third-party defendant-appellant Laidlaw Adams & Peck Inc. ("Laidlaw") (1) in the amount of the judgments entered for Lund's, Inc. and Montgomery against Chemical, and (2) for Chemical's costs and attorney's fees in defending against the claims which resulted in those judgments. Laidlaw does not appeal from that judgment, but rather appeals as the real party in interest contesting the summary judgments for Lund's, Inc. and Montgomery against Chemical, and defending the summary judgment for Chemical against Lund.

This diversity action was brought pursuant to N.Y.U.C.C. § 3–419(1)(c) (McKinney 1964)[2] to recover the face amounts of three

---

1. The notices of appeal were addressed to an opinion and order entered November 28, 1987 that denied motions to reconsider the district court's original opinion and order granting summary judgments, which was entered June 15, 1987 and reported at 665 F.Supp. 218 (S.D.N.Y. 1987). Pursuant to Fed.R.App.P. 4(a)(2), the notices of appeal are deemed to be directed to the judgment subsequently entered January 5, 1988.

2. Although the plaintiffs in this action generally invoke the Uniform Commercial Code, rather than any state's enactment of it, it is only such enactments that have the force of law. We conclude *infra* that the New York Uniform Commerical Code is applicable here. Citations in this opinion correspond to that determination.

checks which Lund, Montgomery and Lund's, Inc. claim were converted because they were paid by Chemical on forged endorsements. On appeal, Laidlaw contends that the district court erred in ruling that N.Y.U.C.C. § 3–406 (McKinney 1964) is not available as a defense to plaintiffs' claims. Lund appeals from the grant of summary judgment against him in favor of Chemical, contesting the district court's finding that Lund's business partner was authorized to endorse the check Lund alleges to have been converted.

For the reasons stated below, we reverse all of the summary judgments and remand.

### Background

#### A. *The Transactions at Issue.*

This action arises out of a fraud committed on or around March 9, 1981 by William Rubin ("Rubin") and Janet Karki ("Karki"), who were officers and directors of Flight Transportation Corporation ("FTC"), a Minnesota corporation engaged in the business of providing aircraft charter and general aviation services. At all pertinent times, Rubin was the chairman and president of FTC, in charge of its day-to-day operations and coordinating its periodic offerings of stock to the public. Lund and Montgomery were directors and shareholders, and Lund a vice president, of FTC. Lund's, Inc. was a privately held Minnesota corporation engaged in a retail food business. Lund was a vice president of Lund's, Inc. and owned approximately thirty percent of its stock.

Lund and Rubin purchased and leased various aircraft together. To facilitate these activities, Lund and Rubin opened joint banking accounts through which each possessed the independent right to write checks. Lund contributed substantial funds toward the purchase of the aircraft, and cosigned loan agreements with Rubin to finance the purchases. Rubin, however, selected the aircraft for purchase, negotiated the related leases, received the lease payments, and made loan and maintenance payments. These activities provided investment tax credits and deductions to Rubin and Lund in connection with their personal income taxes.

Karki was, at all relevant times, FTC's executive vice president and secretary. In addition, she co-owned a Cessna P210 aircraft with Montgomery.

FTC hired Laidlaw in 1980 to comanage a public offering of FTC securities. Prior to this offering, Lund, Montgomery and Rubin proposed various transactions by which FTC was to purchase aircraft owned by Rubin and Lund, Lund's, Inc., and Montgomery and Karki. The public offering and the aircraft sales were to close simultaneously, and details of the proposed aircraft sales were disclosed in the prospectus for the public offering.

The public offering closed in Manhattan on March 9, 1981. Rubin and Karki were present at the closing, but neither Lund, Montgomery nor a representative of Lund's, Inc. attended. At the closing, Laidlaw presented the three checks at issue here, which represented part of the proceeds of the public offering, to FTC. Laidlaw drew the three checks on a Laidlaw account at Chemical, payable to the order of FTC. The check numbers and face amounts were as follows:

| Check | Amount |
|-------|--------|
| 56863 | $716,946.00 |
| 56853 | $400,000.00 |
| 56854 | $ 46,056.00 |

The checks were properly endorsed by Karki, as secretary of FTC, to the following endorsees: check no. 56863 ($716,946) to the order of "William Rubin and Russell T. Lund, Jr.," check no. 56853 ($400,000) to the order of "Lund's, Inc.," and check no. 56854 ($46,056) to the order of "Wardwell Mongtomery and Janet Karki." The checks were endorsed to these entities pursuant to the aircraft transactions discussed above, and represented partial payment[3] by FTC for the purchase of four aircraft from the endorsees. Specifically, check no.

---

**3.** Loans were also to be assumed, and FTC common stock issued, in connection with the aircraft purchases.

56863 represented payment for two aircraft jointly owned by Lund and Rubin, a Learjet 25D and a Learjet 28. Check no. 56853 represented payment for a Mitsubishi MU–2J aircraft owned by Lund's, Inc. Check no. 56854 represented payment for the Cessna P210 aircraft owned by Montgomery and Karki.

The fraud occurred when Rubin endorsed the three checks to the order of Laidlaw as "attorney in fact" for Lund, Montgomery and Lund's, Inc. Rubin presented purported powers of attorney from each of these three endorsees, specifically authorizing the endorsements, to Laidlaw.[4] Karki also endorsed check no. 56854 in her own behalf. The checks, now endorsed to Laidlaw, were used for Rubin's private purchase of FTC securities from Laidlaw. Laidlaw then deposited the checks in its account at Chemical. It is the crediting of these checks to Laidlaw's account by Chemical which plaintiffs allege to constitute payments on forged endorsements by Chemical in violation of N.Y.U.C.C. § 3–419(1)(c) (McKinney 1964). Lund, Lund's, Inc. and Montgomery never received the cash proceeds from FTC's purchase of their aircraft represented by these checks, and have lost their ownership interests in the aircraft.

Rubin and Karki never advised Lund, Montgomery or Lund's, Inc. that the aircraft purchases would occur in Manhattan simultaneously with the public offering of FTC's securities, or concerning the disposition of the cash proceeds of the aircraft sales.

### B. *Prior Proceedings.*

In June, 1982, the Securities and Exchange Commission commenced an action against FTC, asserting that FTC and certain of its officers and directors, including Rubin, had engaged in a massive fraud upon the investing public. Thereafter, FTC was declared bankrupt and placed into receivership. Rubin and Karki were imprisoned for their part in the fraud.

After FTC filed for bankruptcy, investors and creditors of FTC commenced a number of lawsuits against FTC, its officers and directors, auditors, attorneys and underwriters. Pursuant to 28 U.S.C. § 1407 (1982), these actions were accorded multidistrict treatment before Judge Charles Weiner in the United States District Court for the District of Minnesota. Significantly, in one of these cases, *Lund v. Flight Transp. Co. (In re Flight Trans. Corp. Sec. Litig.),* 669 F.Supp. 284 (D.Minn.1985), *aff'd sub nom. Lund v. Norwest Bank (In re Flight Transp. Corp. Sec. Litig.),* 825 F.2d 1249 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988) (*"Lund I"*), Lund brought a conversion claim against a Minnesota bank to recover on a check other than those at issue here, payable to Rubin and Lund as insurance proceeds on a jointly owned aircraft destroyed in a crash. Rubin signed Lund's name as endorser on the check, as well as his own name, and deposited the check in a joint banking account that Rubin and Lund maintained in connection with their joint aircraft business activities.

After a bench trial, the district court ruled that Rubin and Lund were partners with respect to the ownership of six aircraft, including those at issue here. *Lund I,* 669 F.Supp. at 288. The court accordingly held that under Minnesota law, Rubin, who concededly had signed his own name to the check, "had the authority to endorse the check on behalf of the partnership," with the result that "the identity of the party who signed Lund's name to the check is of no consequence." *Id.* The Eighth Circuit affirmed on the basis that "Rubin's status as a partner in the aircraft leasing business made him Lund's agent ... for the purpose of carrying on the usual business of the partnership and thus provided him with the implied authority, as a partner, to endorse Lund's name on the check and to deposit the check in [a partnership] account." *Lund I,* 825 F.2d at 1253.

---

**4.** The district court stated that "[a]ll parties ... apparently agree that none of the plaintiffs signed the [power of attorney] forms and that the signatures thereon are therefore false." In its brief on appeal, however, Laidlaw disclaims any such concession.

The instant action commenced when Lund's, Inc., Lund and Montgomery sued Chemical pursuant to N.Y.U.C.C. § 3–419 (McKinney 1964), which provides a cause of action for conversion where an instrument is paid on a forged endorsement. Chemical then commenced a third-party action against Laidlaw seeking indemnity for breach of warranty of endorsement on the basis that Laidlaw, by endorsing the checks, warranted that all signatures on the checks were authorized, see N.Y.U.C.C. §§ 3–417 (McKinney 1964) and 4–207 (McKinney 1964), and was liable to Chemical for breach of that warranty. All parties in the main action moved for summary judgment, which was granted to Chemical against Lund and to Lund's, Inc. and Montgomery against Chemical. See Lund v. Chemical Bank, 665 F.Supp. 218 (S.D.N.Y. 1987) ("Lund II ").

As to Lund's claim, the district court ruled that Lund and Rubin were partners in an aircraft business,[5] that Rubin therefore had authority to endorse check no. 56863, and that Chemical accordingly did not pay the check on a forged endorsement. Id. at 222–23. The district court reasoned that although "Rubin's actions violated fundamental tenets of partnership law," Chemical as drawee bank had no obligation "to do more than investigate the authority of the signer." Id. at 223.

In ruling for Lund's, Inc. and Montgomery against Chemical, id. at 223–27, the district court held that delivery to a payee is not a requisite to an action for conversion by the payee under N.Y.U.C.C. § 3–419 (McKinney 1964), id. at 224–26, and that N.Y.U.C.C. § 3–406 (McKinney 1964), does not provide a contributory negligence defense to a claim of conversion brought pursuant to section 3–419 by a payee, as distinguished from a drawer or maker, of a check, id. at 226–27. The district court also ruled that Montgomery was entitled to recover the face amount of check no. 56854, $46,056, pursuant to N.Y. U.C.C. § 3–419(2) (McKinney 1964), and indicated that Chemical could recover over

against Laidlaw pursuant to N.Y.U.C.C. §§ 3–417 (McKinney 1964) and 4–207 (McKinney 1964), although not so ruling because Chemical had not yet moved for summary judgment against Laidlaw. Id. at 228.

Subsequently, all parties moved for reconsideration of the district court opinion. Chemical also moved for an order directing Laidlaw to indemnify Chemical for the amount of any judgment rendered against Chemical in favor of Lund's, Inc. and Montgomery, plus Chemical's costs and reasonable attorney's fees. On November 25, 1987, the district court denied all of the motions for reconsideration, and granted Chemical's motion for indemnification from Laidlaw, which determination, as earlier indicated, Laidlaw does not contest.

This appeal followed.

### Discussion

#### A. Summary Judgment.

The district court disposed of all claims in this action by summary judgment. Our review, therefore, is limited to determining whether the district court properly concluded as to each summary judgment that there was "no genuine issue as to any material fact," thus entitling the moving party to "judgment as a matter of law." Fed.R.Civ. P. 56(c). Further, we must determine whether the substantive law was correctly applied, for the identification of material facts for summary judgment purposes "rests on the substantive law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir.1987), cert. denied, —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988). Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party. See Anderson, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; Murray v. National Broadcast-

5. In reaching this conclusion, although eschewing the invocation of collateral estoppel, the district court "adopt[ed] the reasoning of Judge Weiner" in Lund I. Lund II, 665 F.Supp. at 222.

*ing Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988). This same standard is applied by a reviewing court upon appeal from a grant of summary judgment. *See Kronfeld*, 832 F.2d at 731, and authorities there cited.

B. *Applicable Law.*

The district court concluded that since both New York and Minnesota have adopted the Uniform Commercial Code and the Uniform Partnership Act, choice of law is not an issue in this case. *Lund II*, 665 F.Supp. at 222 n. 1. None of the parties to this appeal, furthermore, have briefed or argued and issue of choice of law. We note, however, that states may provide varying interpretations of uniform statutes. We therefore consider the question of the applicable law before turning to the specific issues tendered by the parties for resolution on this appeal.

A federal district court deciding a diversity case applies the same choice of law rules as the state courts in the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since this litigation is a diversity case which commenced in the Southern District of New York, New York rules as to choice of law accordingly govern.

The New York choice of law rule for tort cases is to give "controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation." *Neumeier v. Kuehner*, 31 N.Y.2d 121, 127, 286 N.E.2d 454, 457, 335 N.Y.S.2d 64, 69 (1972). Furthermore:

> [T]here is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction. Where the issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling but the disposition of other issues must turn, as does the issue of the standard of conduct itself, on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented.

*Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 285, 240 N.Y.S.2d 743, 752 (1963).

█ Applying these rules, we conclude that Minnesota law should be used in determining the issue whether Rubin and Lund's business relationship constituted a partnership, and if so, under what circumstances and in what ways Rubin had authority to endorse checks made payable or endorsed to the order of Rubin and Lund. Lund and (apparently) Rubin were citizens and residents of Minnesota, the books and records concerning the aircraft they jointly owned were maintained there, and they maintained a post office box and bank account there for the conduct of transactions relative thereto. *See Lund I*, 669 F.Supp. at 287. We note also the existence of a joint venture agreement between Rubin, Lund and Montgomery dated February 20, 1979 relating to their joint ownership of a Cessna aircraft, which provided for the agreement to be interpreted, and any dispute thereunder to be governed, by Minnesota law. Thus, Minnesota would have the strongest interest in the resolution of the partnership and related issues bearing upon the nature and consequences of the business relationship between Rubin and Lund.

█ New York law, on the other hand, should govern issues relating to the validity and legal effect of the specific transactions which prompt this litigation. As the New York Court of Appeals has stated, *"lex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances." *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978) (per curiam). The alleged conversion in this action took place in New York when Chemical credited Laidlaw's account for the amount of the checks in issue. Furthermore, the closing of the FTC public offering at which those checks were first presented to FTC by Laidlaw, and then negotiated back to Laidlaw via the endorsements challenged in this litigation, also occurred in New York.

We discern no "extraordinary circumstances" precluding the application of New York law. The propriety of applying New York law is also supported by *Hacohen v. Bolliger Ltd.*, 108 A.D.2d 357, 489 N.Y.S.2d 75 (1st Dep't 1985), which held that where an alleged conversion took place in Connecticut, Connecticut law was applicable, despite the parties' significant contacts to New York. *Id.* at 369, 489 N.Y.S.2d at 78. As the court there stated:

> "Where, as here, it is the defendant's standard of conduct that is to be judged, it is appropriate to look to the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders...."

*Id.* (quoting *Bing v. Halstead*, 495 F.Supp. 517, 520 (S.D.N.Y.1980)).

### C. *Summary Judgment Against Lund.*

All the plaintiffs base their conversion claim against Chemical on N.Y.U.C.C. § 3–419 (McKinney 1964), which provides in relevant part:

(1) An instrument is converted when

. . . . .

(c) it is paid on a forged indorsement.

Specifically, Lund in his complaint alleges that Chemical paid check no. 56863 ($716,946) over Rubin's unauthorized endorsement as "attorney-in-fact" for Lund, and Chemical is accordingly liable to Lund for conversion of the check under section 3–419.

The district court, however, granted summary judgment on behalf of Chemical and against Lund on the basis of N.Y.U.C.C. § 3–110(1)(g) (McKinney 1964), which provides that an instrument made payable to the order of a partnership "may be indorsed or transferred by any person thereto authorized." The district court concluded that the Rubin/Lund business relationship constituted a partnership to which check no. 56863 was payable, and that Rubin was authorized, as a partner, to endorse the check. *Lund II*, 665 F.Supp. at 222–23.

On appeal, Lund argues that the district court erred in granting summary judgment in favor of Chemical on this issue for two reasons. First, Lund argues that whether he and Rubin were partners is irrelevant to his conversion claim because the check in issue was not payable to a partnership, but instead to two individuals, each of whom must therefore endorse the check. In the alternative, Lund argues that summary judgment on this issue was inappropriate because there were genuine issues of material fact as to whether Lund and Rubin were partners, and whether in any event Rubin's endorsement was pursuant to partnership business.

■ We agree with the district court that "Rubin and Lund were indeed a partnership with respect to the ownership of the aircraft." *Id.* at 222. The district court found that Rubin and Lund shared in the profits (and losses) of that business; participated jointly in several aircraft purchases, facilitating these purchases by providing financing through personal funds and borrowings secured by notes; held the aircraft jointly; cosigned debt instruments to obtain business loans; and maintained joint bank accounts. *Id.* at 223. Similarly, in *Lund I*, Judge Weiner concluded that a partnership existed between Rubin and Lund because of their co-ownership of the aircraft; their purchase of six airplanes together and carrying out the leasing and operation of the aircraft with the aim of realizing personal tax benefits; and because "each contributed something to the venture and they agreed upon how the benefits derived therefrom were to be divided." *Lund I*, 669 F.Supp. at 288. We perceive no material issue of fact concerning this issue.

■ Judge Sweet went on, however, to determine that "because Rubin and Lund constituted a partnership with respect to the aircraft they jointly owned, Rubin was authorized to endorse the check for the two Learjets on behalf of 'Rubin and Lund,'" *Lund II*, 665 F.Supp. at 223, precluding any liability on the part of Chemical for paying check no. 56863 on a forged endorsement. We do not regard this issue as appropriately determined on a motion for

summary judgment on the record of this case.

Check no. 56863 was endorsed by Karki (for FTC) "to the order of William Rubin and Russell T. Lund, Jr." Rubin then further endorsed the check to Laidlaw in his own name and as attorney-in-fact for Lund, pursuant to a power of attorney by which Lund, without any explicit mention of a partnership, authorized Rubin to:

endorse and negotiate a check or checks on his behalf from Laidlaw Adams & Peck Inc. in the approximate total amount of $716,946 payable to Flight Transportation Corporation and endorsed to William Rubin and Russell T. Lund, Jr., representing the case payment by Flight Transportation Corporation for a Learjet 25D and a Learjet 28 sold by William Rubin and Russell T. Lund, Jr. to Flight Transportation Corporation.

In exchange for the check endorsed to it, Laidlaw transferred FTC securities to Rubin, while depositing the check in Laidlaw's account at Chemical.

To begin with, we regard *Lund I*, whether considered as a precedent or for purposes of collateral estoppel, as clearly distinguishable from the instant case. *Lund I* determined that Lund and Rubin were partners in an aircraft leasing business, which included the two aircraft involved in this case. 825 F.2d at 1253, 669 F.Supp. at 288. *Lund I* further established that Rubin had authority to endorse a check made payable to the order of "William Rubin and Russell T. Lund, Jr.," *see* 825 F.2d at 1251, *in furtherance of partnership business. See* 825 F.2d at 1253 ("Rubin's status as a partner in the aircraft leasing business made him Lund's agent ... for the purpose of carrying on the usual business of the partnership and thus provided him with the implied authority, as a partner, to endorse Lund's name on the check and to deposit the check in [a partnership] account"); 669 F.Supp. at 288 ("The deposit of a check, issued pursuant to partnership business, into a partnership account, is indicative of carrying on the partnership business in the usual way."). We note also that in *Lund I*, the Eighth Circuit concluded that Lund had

not proved any damages because the insurance check was deposited in an active account from which "funds substantially in excess of the amount of the insurance check were later paid ... to cover the legitimate expenses of the aircraft leasing business." 825 F.2d at 1253–54. Here, on the contrary, Lund immediately lost his interest in the aircraft to be purchased with check no. 56863, without receiving any proceeds from that check, when Rubin endorsed the check to Laidlaw.

Turning to Lund's contentions, we consider first his claim that check no. 56863, which Karki endorsed (for FTC) "to the order of William Rubin and Russell T. Lund, Jr.," was not thereby made payable to a partnership between Rubin and Lund, conceding for purposes of this issue that such a partnership existed. The argument is certainly plausible. On the other hand, a check payable "to the order of William Rubin and Russell T. Lund, Jr." was deemed payable to their partnership in *Lund I*, although with no explicit consideration of that question. In *Lund I*, however, Rubin signed Lund's name to the insurance check, whereas here Rubin signed Lund's name explicitly as "attorney-in-fact" for Lund pursuant to a power of attorney which made no reference to any partnership, and on its face appears to be executed by Lund in his individual capacity. This issue merits further exploration on remand.

Lund also contends that there exist genuine issues of material fact (1) as to the existence of a partnership between Rubin and Lund, and (2) whether Rubin's endorsement of check no. 56863 was pursuant to partnership business. For the reasons stated earlier, we reject the first of these contentions, but we are persuaded by the second.

Unlike the situation in *Lund I*, where Rubin endorsed the insurance check to deposit it in a joint bank account which the partnership used in its aircraft business, check no. 56863 was transferred to Laidlaw in exchange for FTC securities which were issued to Rubin alone. On the face of it, such a transaction raises serious questions

concerning the existence of a partnership purpose for its consummation.

As indicated above, the question of Rubin's authority to act for the partnership is to be determined by the law of Minnesota, more particularly by the Uniform Partnership Act, which has been adopted in Minnesota, and Minnesota case law. A partner is an agent of the partnership "for the purpose of its business." Minn.Stat. § 323.08 (1988). "An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." *Id.* "Unless authorized by the other partners …, one or more but less than all the partners have no authority to: … (3) [d]o any … act which would make it impossible to carry on the ordinary business of a partnership." *Id.* Finally, "[n]o act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction." *Id.*

Under this Minnesota statute, Rubin's endorsement of check no. 56863 and immediate purchase of stock for his sole benefit present material factual issues about whether Rubin's actions were authorized by the partnership.

First, Rubin's use of the proceeds from the sale of the partnership property for his sole enrichment raises a factual question concerning whether Rubin's actions were "not apparently for the carrying on of the business of the partnership in the usual way" *see* Minn.Stat. § 323.08 (1988), and accordingly required Lund's explicit authorization. As stated earlier, *Lund I* established only that Rubin had authority to endorse a check payable to the order of "William Rubin and Russell T. Lund, Jr." and deposit it in a partnership account, which was understandably deemed to constitute "carrying on the usual business of the partnership," 825 F.2d at 1253. Here, however, Rubin did not deposit the check into a partnership account, but used it to buy FTC stock for his own account. His actions accordingly present a genuine issue of material fact as to whether or not Rubin

was carrying on the business of the partnership in the usual way, and if not, whether or not his actions were authorized by Lund, the other partner.

Second, on this record, there is also a material factual question about whether Rubin's actions made it "impossible" for the Rubin/Lund partnership "to carry on the ordinary business of [the] partnership," *see* Minn.Stat. § 323.08(3) (1988), in which event they would require authorization by Lund to bind the partnership. Lund argues that, assuming (as we have held above) that a partnership existed between Rubin and Lund, that partnership was created for the purpose of owning aircraft. After the sale of the aircraft at issue, the only possible remaining partnership business would have been to distribute the funds or to buy other aircraft. Instead, Rubin used the proceeds of the sale to buy stock for himself without Lund's knowledge. Under Minnesota law, Lund contends, Rubin's actions made it impossible to carry on the ordinary business of the partnership, and thus required Lund's specific authorization to bind the partnership. *See e.g., Hogs Unlimited v. Farm Bureau Mut. Ins. Co.*, 401 N.W.2d 381, 386 (Minn. 1987) (destruction of herd of hogs, making continuance of partnership business futile, not in furtherance of partnership business as a matter of law); *Winter v. Liles*, 354 N.W.2d 70, 73 (Minn.Ct.App.1984) (partner has no authority to transfer golf course out of the partnership, "since the partnership's business was primarily the operation of the golf course," and since the "statute denies authority to acts of a partner 'which would make it impossible to carry on the ordinary business of a partnership.' Minn.Stat. § 323.08 subd. 3."). We agree with Lund that summary judgment is inappropriate on this record because there is a genuine issue of material fact as to whether Rubin's actions made it impossible to carry on the partnership business, and thus whether Rubin's actions, including his endorsement of check no. 56863, were unauthorized.

Even assuming check no. 56863 to have been endorsed to the order of the Rubin/Lund partnership, it seems to us that a further endorsement of the check by

Rubin for a nonpartnership purpose would not be an endorsement "by any person thereto authorized" within the meaning of N.Y.U.C.C. § 3–110(1)(g) (McKinney 1964),[6] at least on the facts of this case. Judge Sweet saw the matter differently. Although determining that "[i]t is beyond dispute that Rubin's activities violated fundamental tenets of partnership law," *Lund II*, 665 F.Supp. at 223, Judge Sweet concluded that Chemical was nonetheless entitled to summary judgment against Lund, stating:

> Imposing liability on a bank when a signer is authorized to sign the check would require the bank to do more than investigate the authority of the signer; instead, the bank would have to investigate the circumstances of each transaction.

*Id.*

At least on the facts presented here, we consider this formulation unpersuasive. First, the endorsement of Lund's name by Rubin as it appeared on check no. 56863 made no reference to any partnership, but rather to an "attorney-in-fact" relationship. It hardly seems onerous to require a bank to check the bona fides of an endorsee's bald representation that it is authorized to sign a $716,946 check as attorney-in-fact for its co-endorsee. Secondly, Chemical is protected here by a statutory indemnity from Laidlaw, which had a greater opportunity, and therefore perhaps responsibility, to ascertain and assure the regularity of Rubin's actions, although Laidlaw technically stands in the shoes of Chemical as Chemical's indemnitor. Finally, any determination in Lund's favor on this issue will simply put him on an equal footing with the other plaintiffs, still subject (as we hereinafter conclude) to the balancing of performance and responsibility enjoined by

N.Y.U.C.C. § 3–406 (McKinney 1964). *See infra* note 7.

We accordingly conclude that the summary judgment in favor of Chemical against Lund must be reversed.

## D. *Lund's, Inc. as an Alter Ego of Lund.*

Laidlaw contends that the district court erred in rejecting Laidlaw's claim that Lund's, Inc. was a mere "alter ego" of Lund, with the result that Rubin had the same authority to endorse check no. 56853 for Lund's, Inc. as he had to endorse check no. 56863 for Lund.

Noting that Laidlaw cited no law in support of this contention, the district court rejected this novel "alter ego" theory because "Laidlaw has failed to show either that Lund's, Inc. was Lund's alter ego, or that Lund's, Inc. was Rubin's partner with respect to this transaction." *Lund II*, 665 F.Supp. at 223. We affirm the district court's determination of this issue for substantially the reasons stated in the opinion below. *See id.* at 223–24.

## E. *N.Y.U.C.C. § 3–406 (McKinney 1964) Defense to Conversion Claims.*

■ Laidlaw (as indemnitor of Chemical) seeks to assert an affirmative defense to the conversion claims of the plaintiffs under N.Y.U.C.C. § 3–406 (McKinney 1964).[7] Section 3–406 provides that:

> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable

---

**6.** *See also* N.Y.U.C.C. § 1–201(43) (McKinney 1964) ("'[u]nauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery"). As discussed *supra*, the New York statute provides the relevant rule, but the question of authority posed by the New York statute is to be decided under Minnesota law.

**7.** Laidlaw attempts to assert the section 3–406 defense against the conversion claims of all

three plaintiffs. The district court, having previously granted summary judgment to Chemical on Lund's conversion claim, *see Lund II*, 665 F.Supp. at 222–23, only discussed the section 3–406 defense with respect to the claims of Lund's, Inc. and Montgomery, *see id.* at 226–27. Having vacated the summary judgment in favor of Chemical on Lund's claim, *see supra*, we address Laidlaw's section 3–406 defense as it applies to all of the plaintiffs.

commercial standards of the drawee's or payor's business.

Laidlaw claims that plaintiffs' consistently negligent handling of their business affairs vis-a-vis Rubin substantially contributed to Rubin endorsing on their behalf. Specifically, Laidlaw claims that Lund's, Inc. and Montgomery, by failing to attend the March 9, 1981 closing, negligently created the opportunity for Rubin to endorse and negotiate the checks fraudulently. As to Lund, in addition to his failure to attend the closing, Laidlaw claims that negligence pervaded Lund's entire business relationship with Rubin. For instance, Laidlaw claims that Lund never checked the balance of the Rubin/Lund joint checking accounts or ever saw a single check from the accounts.

Without reaching the merits of this claim, the district court ruled that as a matter of law this defense was not available to Chemical. While acknowledging authority to the contrary, Judge Sweet concluded that section 3–406 only applies to the negligence of the drawer of a check, and therefore could not be asserted against the plaintiffs, who were endorsees of the checks in issue. *See Lund II*, 665 F.Supp. at 227.

In support of this holding, the district court cited Official Comments 1 and 2 to U.C.C. § 3–406 (1977), which indicate that section 3–406 derives from case law relating only to, and is intended to apply to, the liability of the drawer or maker of a check. *Id.* at 226. The district court pointed to cases explaining that the rationale behind section 3–406 is to place responsibility on the drawer, who is "the one who sets an instrument in motion," *Fidelity & Deposit Co. v. Chemical Bank New York Trust Co.*, 65 Misc.2d 619, 621, 318 N.Y.S.2d 957, 959 (App.Term.1970), *aff'd mem.*, 39 A.D. 2d 1019, 333 N.Y.S.2d 726 (1st Dep't.1972), and is "well situated to prevent a forgery," *United States Fidelity and Guar. Co. v. Federal Reserve Bank*, 620 F.Supp. 361, 372 (S.D.N.Y.1985), *aff'd*, 786 F.2d 77 (2d Cir.1986) (per curiam).

Finally, the district court based its decision upon the common law rule that negligence is not a valid offense to a conversion action. *See Lund II*, 665 F.Supp. at 227 (citing *Rosenthal v. Manufacturers Hanover Trust Co.*, 30 A.D.2d 650, 291 N.Y.S.2d 19 (1st Dep't 1968)). The district court concluded that section 3–406 only changed the common law with respect to the makers or drawers of the check in a conversion action, and therefore the contributory negligence of the plaintiffs could not be asserted as a defense by Chemical.

Although it is an admittedly close question, we disagree with the district court, and read New York law as allowing section 3–406 to be asserted by a drawee as a defense to a conversion action brought by endorsees. Section 3–406 is broadly worded, and states that it applies to *"any person* [whose] negligence substantially contributes ... to the making of an unauthorized signature"* (emphasis added). Furthermore, there is case support in New York law for the assertion of a section 3–406 defense against a plaintiff who was not the drawer of the check. *See Abraham & Co. v. Dollar Sav. Bank*, 48 A.D.2d 807, 370 N.Y.S.2d 1 (1st Dep't) (issue whether payee was negligent precluded summary judgment on section 3–406 defense), *appeal dismissed*, 38 N.Y.2d 795, 345 N.E.2d 342, 381 N.Y.S.2d 870 (1975). We accordingly conclude that section 3–406 can be asserted by Chemical, the drawee bank, and therefore by Laidlaw as the indemnitor of Chemical, as a defense to the conversion claims of the plaintiffs, the indorsees of the checks in issue.

Having concluded that section 3–406 is applicable, we now address plaintiffs' claim that Laidlaw cannot prevail on this defense as a matter of law. To prevail under section 3–406, Laidlaw must prove: (1) that the plaintiffs' negligence substantially contribute[d] "... to the making of an unauthorized signature," and (2) that Chemical paid the checks "in good faith and in accordance with the reasonable commercial standards of [its] business." *id.* The district court made the following pertinent observation, admittedly in dictum, concerning this issue:

Even if Chemical could assert [a § 3–406] defense, Laidlaw's motion for summary

judgment on that issue would still be denied. Under § 3–406, a negligent plaintiff is precluded from asserting a lack of authority against a drawee "who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." U.C.C. § 3–406. *Neither party* has, as a matter of law, demonstrated the reasonableness or unreasonableness of payment in these circumstances, the negligence or reasonable care of the plaintiffs, the good or bad faith of Chemical, or whether any negligence "substantially contributed" to the forgeries.

*Lund II*, 665 F.Supp. at 227–28 n. 2 (emphasis added).

Plaintiffs nonetheless contend that even if section 3–406 is deemed applicable, summary judgment should be granted in their favor. Plaintiffs correctly assert as the plain language of section 3–406 makes clear, that Chemical cannot raise the issue of plaintiffs' contributory negligence without first establishing its own good faith and compliance with the reasonable commercial standards of its business. Plaintiffs argue that Chemical has provided no proof that, in accepting Rubin's endorsements as "attorney-in-fact" for plaintiffs without (plaintiffs assert) any examination of the powers of attorney that purported to invest Rubin with that authority, Chemical met these requirements. Summary judgment, plaintiffs conclude, is therefore required by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("plain language" of Fed.R.Civ.P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

We decline to address this contention on the present state of the record. As indicated, the district court was of the view that if section 3–406 were deemed applicable, none of the parties had established a case for summary judgment thereunder.

Given the district court's determination that section 3–406 was inapplicable as a matter of law, furthermore, we have no way of knowing whether the parties have been afforded "adequate time for discovery." on the issue, as mandated by *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In addition, if there is conflicting evidence, the issue of a bank's compliance with the reasonable commercial standards of its business is ordinarily best left to the trier of fact. *KOUS–TV, Inc. v. Spot Time, Ltd.*, 599 F.Supp. 90, 92 (S.D.N.Y.1984). We therefore see little gain, and considerable hazard, in any advisory speculations on our part at this juncture, and instead conclude only that the issue should be developed and determined upon remand.

**F.  *Delivery as a Prerequisite to an Action for Conversion Under N.Y.U.C. C. 3–419(1)(c) (McKinney 1964).***

■ Laidlaw seeks reversal of the summary judgments for Lund's, Inc. and Montgomery against Chemical on the separate basis that the checks in issue were never delivered to them. Laidlaw contends that, without delivery, plaintiffs have no property interest in the checks, and therefore no cause of action for conversion under section 3–419.

The district court recognized a split of authority on this issue. *Lund II*, 665 F.Supp. at 224–26. *Compare, e.g.*, J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 15–4, at 588 (until delivery, payee can still recover against drawer and accordingly has no action against drawee for conversion), *with United States v. Bankers Trust Co.*, 17 U.C.C.Rep.Serv. (Callaghan) 136, 141 (E.D.N.Y.1975) (delivery not essential; right to possession, not actual possession, is sufficient). Judge Sweet concluded that delivery was not required because:

[t]o grant recovery to a payee who received the check prior to its misappropriation and deny recovery to one who never saw the check would defeat the purpose of [§ 3–419] and create an ineq-

·uitable distinction in the particular circumstances of this case.

*Lund II,* 665 F.Supp. at 226.

On appeal, Laidlaw claims that the district court erred by rejecting applicable case law in an attempt to reach an equitable result. We disagree, and affirm this ruling.

In *United States v. Bankers Trust Co.,* the district court refused to interpose a delivery requirement in an action for conversion under section 3–419(1)(c), stating:

> Conversion by payment on a forged indorsement is not a possessory action, ... Banks would frequently escape liability for payment on a forged indorsement if it was necessary to show that the check had in fact come into the hands of the payee. It is sufficient that [plaintiff] was entitled to the check ... and that the banks instead paid it to [the forger] or his corporation.

17 U.C.C.Rep.Serv. at 141; *accord, Burks Drywall Inc. v. Washington Bank & Trust Co.,* 110 Ill.App.3d 569, 66 Ill.Dec. 222, 226, 442 N.E.2d 648, 652 (1982) (elements of cause of action under § 3–419(1)(c) are (1) ownership of interest in, or right to possession of, check; (2) forged or unauthorized endorsement; and (3) unauthorized cashing). *But see Caviness v. Andes & Roberts Bros. Constr. Co.,* 508 S.W.2d 253, 256 (Mo.Ct.App.1974) (delivery essential element of check conversion claim); *cf. Papex Int'l Brokers Ltd. v. Chase Manhattan Bank, N.A.,* 821 F.2d 883, 885 (1st Cir. 1987) (under Puerto Rico Negotiable Instruments Law, payee cannot recover from collecting bank that pays on forged endorsement if check never delivered to payee.)

We are persuaded by the reasoning in *United States v. Bankers Trust Co.* that "[c]onversion by payment on a forged indorsement is not a possessory action." 17 U.C.C.Rep.Serv. at 141. Section 3–419(1)(c), on its face, does not mention delivery as an element of conversion; rather "[a]n instrument is converted when ... it is *paid* on a forged indorsement," *id.* (emphasis added). In our view, it would be illogical to hold a·bank subject to liability when the check had actually come into plaintiff's possession and the plaintiff had an opportunity to prevent any forgery, but not liable when the plaintiff was never in a position to prevent forgery. Imposing a delivery requirement would allow banks "frequently [to] escape liability," *United States v. Bankers Trust Co.,* 17 U.C.C.Rep.Serv. at 141, in many of the situations the statute appears designed to reach.

Laidlaw asserts, however, that under applicable New York law: "[A] check has no valid inception until delivery. Delivery means transfer of possession, actual or constructive from one person to another." *Irving Trust Co. v. Leff,* 253 N.Y. 359, 363, 171 N.E. 569, 571 (1930) (citation omitted). Laidlaw's reliance on *Leff* is misplaced. *Leff* involved the rights, under the superseded New York Negotiable Instruments Law, of a depositor who asserted that his bank paid a "non-negotiable check" without the depositor's authorization, and noted that delivery is usually presumed in the case of a negotiable instrument, which a check usually is. *Id.* The instrument at issue in *Leff* was not negotiable because of a restrictive endorsement. *Leff* has no application here.

Moreover, three New York cases implicitly hold that delivery is not a prerequisite to a conversion action under section 3–419(1)(c). *See Capital Dist. Tel. Employees Fed. Credit Union v. Berthiaume,* 105 Misc.2d 529, 536–38, 432 N.Y.S.2d 435, 440 (Sup.Ct.1980) (summary judgment granted to plaintiff under section 3–419(1)(c) where defendant bank paid check over missing endorsement and "neither the check nor the proceeds reached plaintiff"); *Barden & Robeson Corp. v. Tompkins County Trust Co.,* 67 Misc.2d 587, 589, 324 N.Y.S.2d 543, 544–45 (Sup.Ct.1971) (summary judgment for payee against drawee bank on forged endorsement although check was never delivered to the payee); *Sony Corp. of America v. American Express Co.,* 115 Misc.2d 1060, 1061, 455 N.Y.S.2d 227, 230–31 (Civ. Ct.1982) (payee that never received check in issue, which was intercepted by forger, stated valid cause of action against drawee under section 3–419).

We conclude that New York law does not require delivery as a prerequisite to a conversion action under N.Y.U.C.C. § 3–419(1)(c) (McKinney 1964).

G. *Award of Damages to Montgomery.*

Laidlaw's final claim on appeal is that the district court erred in awarding Montgomery the face amount, $46,056, of check no. 56854. Although the summary judgment granted to Montgomery will be reversed, we deem it appropriate to address this issue in the interests of judicial economy.

In ruling that Montgomery could recover the $46,056 face value of check no. 56854, the district court relied, *Lund II*, 665 F.Supp. at 228, upon N.Y.U.C.C. § 3–419(2) (McKinney 1964), which provides:

In an action against a drawee under subsection (1) the measure of the drawee's liability *is* the face amount of the instrument. In any other action under subsection (1) the measure of liability *is presumed to be* the face amount of the instrument.

*Id.* (emphasis added).

The district court also invoked Official Comment 4 to U.C.C. § 3–419, which states:

Subsection (2) ... adopts the rule generally applied to the conversion of negotiable instruments, that the obligation of any party on the instrument is presumed ... to be worth its face value.... In the case of the drawee, however, the presumption is replaced by a *rule of absolute liability.*

*Id.* (emphasis added).

Chemical is clearly a drawee with respect to check no. 56854. Accordingly, if Chemical is liable under section 3–419 for paying that check on a forged endorsement, the general rule postulates liability for the face amount of the check. The question presented here, however, is whether Chemical is strictly liable for the full face value *to a co-endorsee.*

The district court answered in the affirmative, citing primarily *Stapleton v. First Sec. Bank*, 219 Mont. 323, 711 P.2d 1364, 1366–67 (1985), and cases there cited. *Stapleton* in turn cites two New York cases: *Hillsley v. State Bank of Albany*, 24 A.D. 2d 28, 263 N.Y.S.2d 578 (1st Dep't 1965), *aff'd*, 18 N.Y.2d 952, 223 N.E.2d 571, 277 N.Y.S.2d 148 (1966) (mem.); and *Edwards Co. v. Long Island Trust Co.*, 75 Misc.2d 739, 347 N.Y.S.2d 898 (Sup.Ct.1973).

*Hillsley* involved a collecting rather than a drawee bank, and held only that "[i]t was incumbent on the defendant bank to establish that despite the conversion the plaintiff [a copayee] did not sustain damages." *Id.* 24 A.D.2d at 31, 263 N.Y.S.2d at 581. *Edwards* held a collecting bank liable to a copayee for the face amount of two checks where "no one has disputed the claimed oral agreement between [the copayees] that these dual payee checks would be turned over to [the suing copayee]." *Id.* 75 Misc.2d at 740, 347 N.Y.S.2d at 901. We note also *Capital Dist. Tel. Employees Fed. Credit Union v. Berthiaume*, 105 Misc.2d 529, 432 N.Y.S.2d 435 (Sup.Ct. 1980), which held a drawee bank liable to a copayee for the face amount of a check, without discussion of the issue, where it was clear on the facts that the copayee was entitled to that amount. *See also Cartwright Van Lines, Inc. v. Barclays Bank*, 120 A.D.2d 478, 479, 502 N.Y.S.2d 33, 34 (2d Dep't) ("[o]ne of the defenses available to the depository bank [not a drawee] is that the plaintiff is not entitled to all of the proceeds of the check"), *appeal denied*, 68 N.Y.2d 608, 500 N.E.2d 874, 508 N.Y.S.2d 1025 (1986); *Tette v. Marine Midland Bank*, 78 A.D.2d 383, 388, 435 N.Y.S.2d 413, 415–17 (4th Dep't 1981) (same, but criticizing rule of absolute liability for drawee bank in dictum).

Since we have found no New York authority imposing strict liability upon a drawee to a co-endorsee or copayee for the face amount of a check despite a showing by the drawee that the copayee was not entitled thereto, we believe that it would be appropriate upon remand to allow Laidlaw (as indemnitor of Chemical) to make any such showing of which it is capable before ruling definitively on the issue. Laidlaw would clearly have the burden of going

forward and the burden of proof on the issue. *See Hillsley,* 24 A.D.2d at 31, 263 N.Y.S.2d at 581. The question would not be one of fault, which would be litigated under section 3–406, but only as to the extent of Montgomery's interest in check no. 56854 and its proceeds. In this regard, we see no relevance to the fact, pressed by Laidlaw in its brief, that Montgomery received some FTC stock in return for the aircraft exchanged for check no. 56854, since the FTC prospectus made clear that the stock was *additional* consideration for the aircraft. *See supra* note 3.

Just to be clear, we are not ruling at this juncture in favor of Laidlaw on the legal issue presented. The language of section 3–419(2) seems clear that Chemical, as drawee, would be liable for the face amount of check no. 56854 to a *single* payee or endorsee. Montgomery is, however, a *co-endorsee,* and we find New York law, which governs the issue, unclear as to the strict liability of a drawee to a co-endorsee for the face amount of a check where the drawee can prove a defense bearing on the interest of a copayee or co-endorsee in the check and its proceeds. We therefore leave the issue open for later resolution in the light of the facts developed upon remand and the state of New York law at the time the issue is ripe for determination.

### Conclusion

All summary judgments are reversed and the case is remanded for further proceedings not inconsistent with this opinion.