**UNITED STATES GOLD CORPORATION, Plaintiff,**

**v.**

**FEDERAL EXPRESS CORPORATION, Defendant.**

**No. 88 Civ. 5692 (PKL).**

United States District Court, S.D. New York.

Aug. 31, 1989.

---

**22.** The expenses associated with the repair have not been seriously contested.

Jerrold E. Hyams, New York City, Andrew R. Colmant, of counsel, for plaintiff.

Graham & James, New York City, Maureen R. Green, of counsel, for defendant.

## OPINION AND ORDER

LEISURE, District Judge.

This suit arises out of the failure of defendant Federal Express Corporation ("Federal Express") to deliver a package containing gold grain, as more particularly described below. *See* p. 1220, *infra.* Fed-

eral Express accepted the package on or about June 18, 1988 from the office of plaintiff United States Gold Corporation ("U.S. Gold") in St. Petersburg, Florida, for shipment to Rapid City, South Dakota (the "shipment"). Defendant has moved, pursuant to Fed.R.Civ.P. 56, for partial summary judgment on the basis that its liability, if any, is limited to One Hundred Dollars ($100).

For the following reasons, the Court finds the liability limitation enforceable and, therefore, grants defendant's motion for partial summary judgment.

## BACKGROUND

It is worth noting at the outset that, in opposing defendant's summary judgment motion, plaintiff has admitted that "[t]he facts of this case are not in dispute." Affidavit of Andrew R. Colmant, Esq., sworn to on January 16, 1989 ("Colmant Aff."), at p. 1. The following factual discussion is drawn from the submissions of the parties.

Federal Express is an all cargo air carrier certified by the Civil Aeronautics Board and the Federal Aviation Administration to provide interstate cargo transportation services to the public. Federal Express provides such cargo transportation services on the terms contained in its contracts of carriage and service guides. Generally, these terms include a provision limiting the liability of Federal Express for any claim resulting from loss or damage of the cargo shipped with Federal Express to $100, or to a higher value for the cargo if declared by the shipper. *See,* Exhibits E, F, and G, attached to Affidavit of J. Diane Blount, sworn to on November 4, 1988 ("Blount Aff."). If the shipper declares a value higher than $100, the freight rate charged by Federal Express is increased accordingly. With respect to items of extraordinary value, the highest value which may be declared is $500.

*1. Limitation of Liability Agreement.*

The specific agreement between Federal Express and U.S. Gold regarding the shipment in this case was contained in the Federal Express Manifest containing package tracking number 286432282 (the "Mani-

fest"). The Manifest incorporated, by reference, the then current Federal Express Service Guide (the "Service Guide"). *See,* Exhibits F and G, attached to Blount Aff.

The front of the Manifest contained the following language:

By signing, shipper acknowledges and accepts the terms and conditions of shipment and agrees to be bound thereby. Shipper signature ―――――――

Exhibit F, attached to Blount Aff. An agent of U.S. Gold named Nancy Visonmanno prepared and signed the Manifest, on behalf of plaintiff.

The bottom of the front page of the Manifest contained the following language concerning the potential liability of Federal Express for failure to deliver the shipment in an undamaged condition or in an untimely manner:

In tendering these shipments, shipper agrees that Federal Express shall not be liable for special, incidental or consequential damages arising from carriage thereof. Federal Express shall not be deemed to have made, and shipper disclaims all warranties, express or implied, with respect to these shipments. This is a non-negotiable manifest subject to conditions of contract set forth on reverse side of shipper's copy. Unless shipper declares a higher value, the liability of Federal Express Corporation is limited to $100.00 per shipment.

Exhibit F, attached to Blount Aff. Above this language on the Manifest, a space is provided to permit the declaration of a higher value for shipments, and for the resulting adjustment of freight rates. These spaces on the Manifest are blank, as U.S. Gold declared no value in addition to $100 for the shipment.

The provisions of the contract of carriage regarding the limitation of liability and the declared value were restated on the back of the shipper's copy of the Manifest, as follows:

DECLARED VALUE AND LIMITATION OF LIABILITY. THE LIABILITY OF FEDERAL EXPRESS IS LIMITED TO THE SUM OF $100.00 PER PACKAGE unless a higher value is declared for carriage herein and a greater charge paid at the rate of 30 cents per $100.00 value. In the case of P–1 service the maximum higher declared value is $5,000.00. In the case of Courier Pak, or Standard Air Service, the maximum higher declared value is $2,000.00. In the case of Overnight Letter, the maximum higher declared value is $500.00. Shipments containing items of extraordinary value, including, but not limited to drawings, paintings, sculptures, porcelain, ceramics, furs, jewelry, fur trimmed clothing, watches, gems, stones, money, bullion, currency, coins, trading stamps, or other extraordinary valuable items, are limited to a maximum declared value of $500.00. In the case of P–1 service when multiple shipments are placed on a single airbill but the shipper has not specified the declared value for each individual shipment, the declared value for each individual shipment will be determined by dividing the total declared value on the airbill by the number of shipments indicated on the airbill, subject to a $100.00 minimum declared value per individual shipment. In the case of Standard Air Service when the shipment consists of two or more pieces, the declared value for each piece will be determined by dividing the declared value on the airbill by the number of pieces in the shipment. The liability of Federal Express is limited to the declared value of the shipment or the amount of loss or damage actually sustained, whichever is lower.

Exhibit F, attached to Blount Aff.

The Manifest also incorporated the Service Guide by reference. *See* Exhibit F, attached to Blount Aff. The Service Guide restated and explained the limitation of liability published on the back of the Manifest.

*2. The Shipment.*

For most of the year, plaintiff is a normal customer of Federal Express; that is, Federal Express makes two deliveries in the morning and two pickups in the afternoon. For approximately three months of the year, namely during the Christmas rush, U.S. Gold is probably Federal Ex-

press' biggest customer in the St. Petersburg area. The package at issue here is one of several thousands of packages U.S. Gold has shipped annually via Federal Express.

On or about June 18, 1988, Federal Express accepted the package which is the subject of this action from U.S. Gold in St. Petersburg, Florida for shipment to Rapid City, South Dakota. A representative from Federal Express arrived at the St. Petersburg location a little after 3:00 p.m. The procedure for such pickups is that a security officer of U.S. Gold advises the Shipping Department upon the arrival of the Federal Express driver, and U.S. Gold employees bring the shipment out of the premises, where it is turned over to the Federal Express driver. At this point the Federal Express driver puts his employee number on the manifest, as well as the date, the time, and the number of packages he receives. He also indicates whether it is a regular stop.

Finally, the driver goes over each of the packages with a portable recording device. A communications satellite picks up a notation for each package from the device, and that notation is immediately placed on Federal Express computers.

Nine shipments were reflected on the Manifest, and the Federal Express computer acknowledged receipt of the nine shipments. The particular shipment that is the subject of this case is number 9. That shipment, denominated by U.S. Gold as #210507, was the largest of the nine by weight, at approximately 17 pounds. The shipment was consigned to a sister company of the plaintiff in South Dakota.

When the shipment did not arrive, U.S. Gold began to trace the shipment through Federal Express. It is clear that Federal Express actually received the package, and that the shipment was initiated pursuant to the terms of the defendant's Manifest and Service Guides. The package was lost, however, while in the custody of Federal Express, and there is no evidence of knowledge by any party as to how the loss occurred. *See, e.g.,* Colmant Aff. at 2. Federal Express acknowledges that it is unable

to locate the package, and that plaintiff does therefore have a claim. The particular package of gold had a total weight of 6,999.4 grams, or approximately 17 pounds. Based upon the gold price of June 18, 1987, or $452.20, the value of the package was $101,761.16. Plaintiff paid a premium of $281.25 to obtain the gold, for the net value at issue here of $102,042.41.

On July 10, 1987 Federal Express issued a check to U.S. Gold for $118.50. There was no declared value listed on the airbill, which Federal Express claims limits its liability to $100.00. The remaining $18.50 represents a freight reimbursement. *See* Exhibit I, attached to Blount Aff.

Plaintiff suffered a prior loss in March, 1987, which also involved a shipment via Federal Express. That delivery was to a firm in New York, and involved a loss of $10,000. *See,* Exhibit C, attached to Colmant Aff.

Corrective action has been taken since the incident which is the subject of this dispute. Plaintiff has now availed itself of a special Federal Express service where a particular document follows a shipment all the way, with every Federal Express employee who touches the package signing for it. This measure provides added security, and it costs an extra $15.00 per shipment. Plaintiff has additionally altered its practice of sending such large quantities of gold in a single package to its South Dakota affiliate. The normal package usually does not exceed $50,000.00 to $60,000.00 in value, and the usual shipment does not exceed one or two pounds.

DISCUSSION

This is an action for breach of contract, negligence and conversion in connection with the failure of Federal Express to deliver the package. Plaintiff commenced the action in New York State Supreme Court in July, 1988, but Federal Express removed the suit to this Court on or about August 15, 1988. Federal Express asserts diversity of citizenship as the basis of jurisdiction in this Court.

The answer raised the central affirmative defense that plaintiff's claim for al-

leged loss or damage to goods shipped with Federal Express is limited to a maximum of $100.00 by the terms of the applicable contract of carriage and Federal Express Service Guide. Defendant has moved for summary judgment on that basis. Plaintiff has had ample opportunity for discovery, and has not requested any additional discovery under Fed.R.Civ.P. 56(f).

*I. Standards.*

The standards for summary judgment are well established. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 1) (citation omitted). The court's function in a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.1989); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317 (2d Cir.1975). Summary judgment may be granted pursuant to Fed.R.Civ.P. 56 where "there are no unresolved factual disputes as to the issues material to the outcome of litigation." *King Service, Inc. v. Gulf Oil Corp.,* 834 F.2d 290, 295 (2d Cir.1987).

In ascertaining whether there are material issues to be tried, the court must "resolv[e] ambiguities and draw[ ] *reasonable* inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (emphasis added); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985). If a material factual issue may only be determined by a trier of fact, namely, if the material issue could reasonably be re-solved in favor of either party, summary judgment is not proper.

Identification of which facts are "material" is determined by reference to the substantive law governing the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment ... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment always bears the initial burden of informing the Court of the basis for its motion. *Celotex Corp. v. Catrett, supra,* 477 U.S. at 323, 106 S.Ct. at 2553. "The burden on the moving party will be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. However, there is no requirement that the movant must support its motion with affidavits or other similar material negating the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553. Where the non-moving party "will bear the burden of proof at trial on a dispositive issue," a summary judgment motion "may properly be made in reliance solely" on the pleading, depositions, interrogatory answers and admissions.

When this initial showing is made, it becomes the non-moving party's burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511; *King Service Inc., supra,* 834 F.2d at 295. The plain language of Rule 56(c) mandates the entry of summary judgment where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be " 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett, su-*

*pra,* 477 U.S. at 323, 106 S.Ct. at 2552. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also, King Service Inc., supra,* 834 F.2d at 294–295; *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989); *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1115 (S.D.N.Y.1987). Thus, Rule 56(e) requires that when one party moves for summary judgment and supports the motion with affidavits and exhibits, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). This requirement is especially pertinent where, as here, a defendant has moved for summary judgment and the evidence before the Court calls into doubt one or more elements of the plaintiff's *prima facie* case. *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1043 (2d Cir.1986); *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

■ In order to survive a summary judgment motion, plaintiff must present supporting facts and arguments showing some legal basis for liability on the part of the defendant; it is not enough simply to put forth conclusory allegations of wrongdoing. *Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York,* 866 F.2d 38, 42 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). The supporting affidavits cannot merely quote the contentions set forth in the complaint. *L & L Started Pullets, Inc. v. Gourdine* 762 F.2d 1, 3–4 (2d Cir.1985).

## II. Contractual Limitation.

As indicated above, plaintiff admits that "the facts of this case are not in dispute." *See* Colmant Aff. at 1. Plaintiff neverthe-

less claims that the Federal Express Manifest appears "similar to a receipt," rather than a uniform bill of lading which could have been employed by Federal Express. *See,* Plaintiff's Memorandum in Opposition, at 12; Plaintiff's Statement of Converted [sic] Facts. Plaintiff does not elaborate on the significance of this assertion, but perhaps plaintiff believes that if the document here was only a receipt, it could argue that a contract of carriage containing a limitation clause did not exist and, presumably, whatever contractual arrangement did exist would have no limitation. It may also be that plaintiff is attempting to assert a material issue of fact involving the actual agreements reflected by the instruments here. Finally, plaintiff may seek to tie the lack of a federally regulated bill of lading into its objection to the application of federal law.[1]

Whatever plaintiff's arguments in this connection might be, its position is without merit. In the present case, classification of the Manifest as a bill of lading does not present a material question of fact. Black's Law Dictionary defines a bill of lading as follows:

> Document evidencing receipt of goods for shipment issued by person engaged in business of transporting or forwarding goods and it includes airbill. U.C.C. § 1–201(6). An instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it, stating the name of the consignor, the terms of the contract for carriage, and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place. It is receipt for goods, contract for their carriage, and is documentary evidence of title to goods. *Schwalb v. Erie R. Co.,* 161 Misc. 743, 293 N.Y.S. 842, 846.

It is undisputed that Federal Express is an interstate common carrier which issued the Manifest upon tender of the package. It is undisputed that the Manifest contained the terms and conditions of the shipment, in-

---

**1.** Since deregulation, there is no general federal prescription of uniform bills of lading or tariffs as there once was. As indicated below, how-

ever, that most certainly does not indicate that application of federal law is improper.

cluding the recipient, price, means of payment, method of shipment, and identification of the package. It is undisputed that the plaintiff signed the Manifest, thereby acknowledging its agreement to the terms and conditions of shipment contained therein. Plaintiff's argument that the Manifest must be labeled a mere "receipt," and that somehow it is not a bill of lading embodying the contract of carriage, has no basis as a matter of law.

### III. Limitation of Liability.

#### 1. Applicable Law.

Federal Express seeks to have its liability limited to the declared value as stated by the parties in their contract of shipment, based upon federal common law principles. Before determining the validity of a limitation of liability, the threshold issue of applicable law must be examined.

Historically, the area of interstate contracts of carriage has been an exclusively federal realm. In *Adams Express Co. v. Croninger*, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913), the Supreme Court made it clear that Congress had occupied the field, and superseded the diversity of state regulation on the subject matter. *Id.* at 504–506, 33 S.Ct. at 151–52.

This principle was preserved when air carriers were subjected to statutory regulation schemes.[2] Both the Civil Aeronautics Act and the Federal Aviation Act contained a savings provision preserving "the remedies now existing at common law or by statute ..." 49 U.S.C. § 1506 (1976). The statutory scheme "expressly incorporated the entire federal common law applicable to carriers." *See, e.g., Klicker v. Northwest Airlines, Inc.*, 563 F.2d 1310, 1314 (9th Cir.1977).

Thus, prior to the Airline Deregulation Act of 1978, this Circuit applied federal law to air carrier liability, even though "the liability of air carriers is not created by statute as is the case with surface carri-

ers." *North American Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir.1978).[3] Federal law recognized that "both the rights and liabilities as between an airline and a shipper are determined by the shipper's valid tariffs," and that "it is clear that a carrier's valid tariffs which are applicable to the shipment at issue govern not only the nature and extent of its liability, but also the nature and extent of the shipper's right of recovery." *Id.* The Court in *North American Phillips* held that a "claim based upon the loss of goods during interstate transportation by [defendant] as a common carrier for hire ... sets forth a claim arising under federal law." *Id.* at 234. (*citing Blair v. Delta Air Lines, Inc.*, 344 F.Supp. 360, 365 (S.D.Fla.1972)).

The statutory scheme involving the regulation of air carriers was significantly curtailed by the Airline Deregulation Act of 1978. The validity and essential rationale of *North American Phillips* and similar cases, however, has not been eliminated by deregulation. Since deregulation, the Second Circuit has returned to federal common law for guidance when determining the validity of a carrier's limitation of liability. *See, e.g., Ruston Gas Turbines, Inc., v. Pan American World Airways*, 757 F.2d 29, 30 (2d Cir.1985) ("Deregulation of certain common carriers returns us to the common law.")

A balancing of the state and federal interests affected, *see In re "Agent Orange" Liability Litigation*, 635 F.2d 987, 990–95 (2d Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), further indicates that application of federal law is proper. The Second Circuit has, for instance, concluded that the federal interest in maintaining a uniform regulatory scheme for international mail requires the application of uniform liability standards for claims arising from nondelivery. *See Lerakoli, Inc. v. Pan American World Airways, Inc.*, 783 F.2d 33, 37 (2d Cir.),

---

**2.** The Civil Aeronautics Act of June 23, 1938 established a regulatory pattern for air carriers similar to that in force for railroads. This was followed by the Federal Aviation Act of August 23, 1958.

**3.** *But see, Lichten v. Eastern Airlines*, 189 F.2d 939 (2d Cir.1951).

*cert. denied,* 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 54 (1986). The interests implicated by national air cargo carriage are similar. This is not uniformity "prized for its own sake," *see In re "Agent Orange" Liability Litigation,* 635 F.2d at 994, but a legitimate uniformity, necessary for parties wishing to structure their primary actions, in accord with settled and non-varying standards.

▪ Courts have repeatedly and specifically applied federal law after deregulation to determine the enforceability of declared value liability limitations in interstate air carrier contracts of carriage. *See, e.g., First Pennsylvania Bank N.A. v. Eastern Airlines,* 731 F.2d 1113, 1115 (3d Cir.1984); *Arkwright Boston Mfrs. v. Great Western Airlines, Inc.,* 767 F.2d 425, 427 (8th Cir. 1985); *Angela Cummings, Inc. v. Purolator Courier Corp.,* 670 F.Supp. 92 (S.D.N.Y.1987). The weight of authority on this point is clear; federal common law is applicable to the enforcement of the liability limitation provision here.

### 2. Federal Law

In turning to the application of federal common law principles to the contract of carriage at issue here, it is helpful to begin with a brief review of the law involving rail carriers, at and after enactment of the Interstate Commerce Act in 1887.

Historically, under the common law of interstate carriage as applied by federal and state courts, it was generally held that public policy forbade contracts of carriage where the carrier sought to exculpate itself from liability for its own negligence. *See Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913). However, a sharp distinction was drawn between such exculpatory provisions and provisions which merely limited liability to the agreed value of the property shipped, where the amount of the rate depended upon the value of the shipment. *See Hart v. Pennsylvania Railroad,* 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884).

In the latter situation, the limitation of the carrier's liability was viewed as a consequence of the calculation of the transportation charge based upon the agreed value, rather than as an exculpation from negligence. In a suit against the carrier in such a case, the carrier's negligence was assumed to exist, rather than be avoided; the limitation of the shipper's damages to the agreed value was merely a consequence of the assumption that the agreed upon value was the true value of the property transported. Absent the released value agreement, the carrier's liability would be limited by common law principles to the actual true value of the property. The agreed upon value merely constituted an estoppel against the unfairness of asserting a larger amount as the "true" value, when a smaller value had been used to calculate the rate. The legal validity of an agreed value contract enabled the carrier's rate to be reasonably proportioned to the risk to which it was exposed. *See First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1115–16 (3d Cir.1984).

This rationale has continued to underlie common law principles throughout various periods of regulatory legislation. Following the enactment of both the Interstate Commerce Act of February 4, 1887, 24 Stat. 379, and the Hepburn Act of June 29, 1906, 34 Stat. 584, section 20 of which contained the provision known as the Carmack amendment, the same distinction was observed. *See Adams Express Co. v. Croninger,* 226 U.S. 491, 509–10, 33 S.Ct. 148, 153–54, 57 L.Ed. 314 (1913).

▪ There are essentially two requisites of a valid, enforceable limitation on liability, namely, that "[1] the limitation of liability was the result of a 'fair, open, just and reasonable agreement' between carrier and shipper, entered into by the shipper 'for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount or risk' ... and [2] the shipper was given 'the option of higher recovery upon paying a higher rate.'" *Shippers National Freight Claim Council, Inc. v. ICC,* 712 F.2d 740, 746 (2d Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984) (quoting *Adams Express Co. v. Croninger,* 226 U.S. 491, 509–510, 33 S.Ct. 148, 153–54, 57 L.Ed. 314 (1913) and *Bos-*

*ton & Main Railroad v. Piper,* 246 U.S. 439, 444, 38 S.Ct. 354, 355, 62 L.Ed. 820 (1918)). In evaluating whether those requisites are met, courts have considered such factors as: (1) whether the carrier has given adequate notice of the limitation of its liability to the shipper; (2) the economic stature and commercial sophistication of the parties; and (3) the availability of "spot" insurance to cover a shipper's exposure. *See General Electric Co., v. MV Nedlloyd,* 817 F.2d 1022, 1028 (2d Cir. 1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988); *Ruston Gas Turbines, Inc. v. Pan American World Airways,* 757 F.2d 29, 32–33 (2d Cir.1985); *First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc., supra,* 731 F.2d at 1122.

In the years since deregulation, courts have consistently continued to apply these principles to enforce the declared value limitation of liability provision in airbills and other contracts of carriage of Federal Express and other small package express carriers. *See, e.g., Husman Construction Co. v. Purolator Courier Corp.,* 832 F.2d 459 (8th Cir.1987); *First Pennsylvania Bank v. Eastern Air Lines,* 731 F.2d 1113 (3d Cir.1984); *Deiro v. American Airlines, Inc.,* 816 F.2d 1360 (9th Cir.1987). *Angela Cummings, Inc. v. Purolator Courier Corp.,* 670 F.Supp. 92 (S.D.N.Y.1987); *Reliance Insurance Co. v. Federal Express Corporation,* 84 Civ. 6498 (PNL), slip op., 1985 WL 2241 (S.D.N.Y.1985); *Allied Corporation v. Federal Express Corporation,* CV 86–381(RR), slip op. (E.D.N.Y.). *See also, Uniden Corporation of America v. Federal Express Corporation,* 642 F.Supp. 263 (M.D.Pa.1986); *Apartment Specialists, Inc. v. Purolator Courier Corp.,* 628 F.Supp. 55 (D.D.C.), *aff'd without opinion,* 804 F.2d 153 (D.C.Cir.1986).

■ Applying these standards to the case at bar, it is clear that limitation of liability for Federal Express is valid and enforceable, as a matter of law.

The instant limitation of liability was plainly the result of a "fair, open, just and reasonable" agreement between U.S. Gold and Federal Express. It is undisputed that both parties are sophisticated commercial entities. Moreover, from its extensive previous use of Federal Express, U.S. Gold had more than adequate notice of Federal's limitation of its liability. The prior loss of a U.S. Gold package demonstrates plaintiff's awareness of the limitation provision. Finally, U.S. Gold secured protection for its shipment from an outside insurer. *See,* Exhibit I, attached to Blount Aff.

It is also clear that the second requirement of the common law, i.e., that shippers be afforded the option of obtaining higher recovery from Federal Express upon paying a higher rate, is similarly satisfied here. Plaintiff had a clear opportunity to obtain full coverage. U.S. Gold simply had to send more packages, limiting the value of each, and paying the rate set for packages of such value. In this way Federal Express reasonably spreads the risk of its low-cost service.

Under federal common law, the declared value limitation of liability in a contract of carriage applies to claims sounding in tort as well as in contract. As the court in *Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261 (8th Cir.1984) stated, "all actions against a common carrier, whether designated as tort or contract actions, are governed by federal statute, and no recovery can be had in excess of the amount permitted by [the] terms of the contract." *Id.* at 1264 (*citing Southeastern Express Co. v. Pastime Amusement Co.,* 299 U.S. 28, 30, 57 S.Ct. 73, 74, 81 L.Ed. 20 (1931)). *See also Hart v. Pennsylvania Railroad Co.,* 112 U.S. at 340, 5 S.Ct. at 155 ("[I]t is just to hold the shipper to his agreement as to value even where loss has occurred through negligence of shipper"); *Husman Construction Company, supra,* 832 F.2d at 461 (carrier may limit liability for actual damages resulting from negligence).

Under federal common law, a declared value limitation of liability provision is also enforceable against a claim of conversion. *See Lerakoli, supra,* 783 F.2d at 37 (2d Cir.1986); *Angela Cummings, supra,* 670 F.Supp. 92 (S.D.N.Y.1987). Moreover, a plaintiff alleging conversion against a common carrier must plead and prove willful or

intentional misconduct of the common carrier. *Lerakoli, supra,* at 37–38 (*citing Glickfield v. Howard Van Lines, Inc.,* 213 F.2d 723, 727 (9th Cir.1954)). The burden of proof at trial would be on the plaintiff.

Plaintiff alleges conversion based solely upon defendant's lack of explanation for the loss. This allegation is entirely unsupported, however, and is not sufficient to withstand a motion for summary judgment. The plaintiff does not plead willful or intentional misconduct by the defendant, nor does the record indicate facts supporting the existence of any such conduct. In accord with the standards discussed above, the conclusory conversion claim here cannot withstand defendant's motion for summary judgment.

In finding Federal Express' limitation valid under federal common law, the Court recognizes one of the essential public policies underlying the deregulation of the air transportation industry:

> The placement of maximum reliance on competitive market forces and on actual and potential competition (A) to provide the needed air transportation system, and carriers to earn adequate profits and to attract capital ...

49 U.S.C. § 1302(a)(4) (1970 ed. and Supp.1988). As the Eight Circuit Court of Appeals has stated:

> The purpose of deregulation was to allow competition and the marketplace to determine rates and practices in the air transportation industry. *See* 49 U.S.C. § 1302(4) (1982). Congress, however, has not relinquished complete control over air transportation ... Given Congress' retention of significant control over air transportation, we hold that federal common law governs [the air carrier's] liability.

*Arkwright–Boston Mfrs. v. Great Western Airlines Inc.,* 767 F.2d 425, 427 (8th Cir. 1985).

This emphasis on competitive market forces cautions against undue interference with the contractual arrangements of two commercially sophisticated parties. U.S. Gold chose Federal Express fully aware of the limitation on liability, and the resulting low transport rate. To take advantage of that low rate, U.S. Gold did not represent the value of its goods, and avoided packaging them in a way that would have safeguarded their true value. It then adequately protected itself through separate insurance.

### 3. State Law.

█ As discussed above, under federal law the declared value limitation of liability provision in the Manifest limits Federal Express' liability to $100. This is dispositive of the issues here, and partial summary judgment will be granted for defendant on that basis.

Because of plaintiff's apparently exclusive reliance on state law, or more accurately on a single New York state case, however, the Court will briefly comment on the issue from the perspective of an unlikely application of state law. It becomes immediately apparent that even if state law applied, which it does not, the same result would ensue.

Under Uniform Commercial Code provisions adopted in both New York and Florida, a bailee may contractually limit its liability for negligence. *See* U.C.C. § 7–309(2). *See also Sanfisket, Inc. v. Atlantic Cold Storage Corp.,* 347 So.2d 647 (Fla. 3d DCA 1977), *cert. denied,* 357 So.2d 187 (Fla.1978); *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980). Plaintiff does not attempt to assert its claim for negligence in contravention of this settled principle.

Plaintiff instead relies on its allegation that Federal Express converted the property, through its failure to deliver the shipment without an explanation. In this regard plaintiff cites a bailee warehouse case, *ICC Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980). That case states that the contractual liability limitations that may have been imposed by a bailee are not available in the case of conversion, under New York state law. The plaintiff's exclusive reliance on *ICC Metals,* however, is misplaced.

Even if state law were to apply, New York choice of law principles would likely indicate that the substantive law of Florida would govern the enforceability of the limitation provision. A federal district court deciding a diversity case applies the same choice of law rules as the state courts in the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lunds Inc. v. Chemical Bank*, 870 F.2d 840, 845 (2d Cir. 1989). In both tort and contract contexts, New York generally employs an "interest analysis" to resolve choice of law conflicts: " '[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.' " *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). *See also, Miller v. Miller*, 22 N.Y.2d 12, 17, 290 N.Y.S.2d 734, 738, 237 N.E.2d 877, 881 (1968); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279, 288 (1963). Florida appears to have the greatest interest in the litigation as both parties do business in Florida, the contract of carriage was entered into in Florida, and at least part of the shipment took place in Florida.[4] *See Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382–85, 300 N.Y. S.2d 817, 825–28, 248 N.E.2d 576, 584–88 (1969).

Under Florida law, a bailee may contractually limit its liability for breach of contract or negligence, but not for conversion under that state's enactment of U.C.C. § 7–309(2). However, under Florida law, an unexplained loss only gives rise to a presumption of negligence, and *not* of conversion. The bailor bears the burden of proving conversion at all times. *See, e.g., Sanfisket Inc. v. Atlantic Cold Storage Corp.* 347 So.2d 647 (Fla. 3d DCA 1977),

*cert. denied*, 357 So.2d 187 (Fla.1978); *Marine Office–Appleton & Cox Corp. v. Aqua Dynamics, Inc.*, 295 So.2d 370 (Fla. 3d DCA 1974). As indicated in the discussion above, the sole basis for the present claim of conversion in this case is the unexplained loss of the shipment. In accord with the applicable standards set out above, this bare allegation is insufficient to avoid summary judgment for defendant.

Furthermore, even if New York state law were to apply, it is far from clear that the plaintiff's interpretation of *I.C.C. Metals* would represent the correct view of the application of that law to the situation presented by this case. As the Second Circuit has stated in a related context:

> [E]ven if state law were to be applied, we are not convinced that New York would apply the rule of *I.C.C. Metals*. At issue there, was the liability of a warehouseman commissioned to store packages in a specific warehouse. The court reasoned that because the bailee was in sole control of the packages throughout the bailment period, it was in the best position to explain the loss of the property. *I.C.C. Metals, Inc. v. Municipal Warehouse Company*, 50 N.Y.2d at 665, 431 N.Y. S.2d at 377 [409 N.E.2d 855]. The carriage of mail by an agent of the USPS, however, obviously is quite a different case. Mail, by its nature, does not stay in one place, but rather changes hands numerous times in transport. Consequently, the lack of control of the goods readily distinguishes this case from *I.C.C. Metals*.

*Lerakoli, supra*, 783 F.2d at 38. *But see RGA Industries Inc. v. Jomas Express Inc.*, 129 Misc.2d 1066, 499 N.Y.S.2d 28 (1st Dept.1985).

In any event, these discussions go far beyond what is necessary for present purposes. Federal law applies, and, under

---

**4.** While not directly addressing the choice of state law issue, plaintiff implicitly recognizes that if state law applied, it would be the law of Florida. For example, plaintiff cites *Lonray, Inc. v. Azucar, Inc.*, 568 F.Supp. 189 (M.D.Fla. 1983), *aff'd in part, rev'd in part*, 775 F.2d 1521 (11th Cir.1985), which applied Florida law.

Although *Lonray* also cited *I.C.C. Metals*, it did *not* involve an interstate carrier, a limitation of liability provision, nor, significantly, a claim of conversion. *Lonray* does not establish that the Florida law on this point is the same as plaintiff's argued interpretation of *I.C.C. Metals*.

**1228**

that applicable law, partial summary judgment for defendant is proper.

### CONCLUSION

Defendant's motion for partial summary judgment is granted, and its liability, if any, is limited to $100. If a stipulation of settlement is not executed by October 20, 1989, counsel for the parties shall appear at a pre-trial conference on that day in Courtroom 36 at 3:30 p.m.

SO ORDERED.