**INGRAM MICRO, INC., and Ingram Micro, Inc. a/s/o Chubb Insurance Company of Europe, S.A., Plaintiffs,**

v.

**AIROUTE CARGO EXPRESS, INC., Defendant.**

**No. 99 Civ. 12480(SAS).**

United States District Court, S.D. New York.

Aug. 3, 2001.

Peter D. Fenzel, Fenzel & Associates, L.L.C., New York City, for Plaintiffs.

Frederic P. Schneider, Gilman & Schneider, New York City, for Defendant.

**OPINION AND ORDER**

SCHEINDLIN, District Judge.

On December 29, 1999, Ingram Micro, Inc. ("Ingram Micro"), on behalf of itself and as subrogee of Chubb Insurance Company of Europe, S.A. ("Chubb"), filed suit against Airoute Cargo Express, Inc. ("Airoute") to recover damages in the sum of $434,894 [1] plus interest for alleged breach of contract. Specifically, Ingram Micro alleged that Airoute breached its duties and obligations as a common carrier and bailee of goods by failing to deliver those goods. After the close of discovery, Ingram Micro and Airoute agreed to try the case on stipulated facts. The parties have submitted thirty-six stipulated facts and one trial exhibit, the bill of lading between Ingram Micro and Airoute. Both parties have also submitted post-trial memoranda briefing their respective positions as to whether federal common law or Canadian law applies to this action and whether Airoute's liability is limited under the applicable law. For the reasons stated below, the Court finds that federal common law applies to this action and that, under federal common law, the limitation of liability on Airoute's bill of lading is enforceable.

## I. BACKGROUND

Ingram Micro is a Delaware corporation with its principal place of business in Santa Ana, California. *See* Stipulated Facts and Trial Exhibit ("St.Facts") ¶ 1. Chubb, a Belgian corporation, has its principal place of business in London, England. *See id.* ¶ 2. Airoute is a Canadian corporation with its principal place of business in Dorval, Quebec. *See id.* ¶ 3.

---

1. All monetary values in this Opinion and Order are in United States dollars unless otherwise indicated.

In November 1997, Ingram Micro hired Airoute to transport an order of 549 boxes of "Corel Draw 8" ("Corel") software and 2550 boxes of Corel upgrade software from Saturn Corporation's warehouse in St. Laurent, Quebec, Canada to Ingram Micro's warehouse in Harrisburg, Pennsylvania. *See id.* ¶ 4. Airoute transmitted its terms for the contract of carriage from its offices in Quebec to Ingram Micro's offices in California. *See id.* ¶ 5. Ingram Micro then transmitted its acceptance of Airoute's terms from California to Quebec. *See id.* ¶ 8. During the negotiations, Airoute did not offer Ingram Micro an *ad valorem* freight rate with no limitation of liability. *See id.* ¶ 6. Instead, Airoute quoted only one freight rate to Ingram Micro, which contained a limitation of liability and was not subject to negotiation. *See id.* ¶ 7.

On or about November 13, 1997, Airoute took possession of the shipment in apparent good order and condition from the Saturn Corporation warehouse in St. Laurent, Quebec. *See id.* ¶¶ 9, 16. At this time, Airoute issued a bill of lading covering the shipment from St. Laurent, Quebec to Harrisburg, Pennsylvania. *See* Airoute's Bill of Lading for Ingram Micro Delivery ("Airoute's BOL"), Trial Exhibit, ¶ A. Ingram Micro did not declare a value for the shipment on this bill of lading. *See id.* If a value had been declared, Ingram Micro would have been required to pay a higher freight rate for a higher recovery in case of loss to the shipment. *See id.* Without a declared value, the maximum default coverage for shipments, as stipulated by the bill of lading, is the "lesser of $100.00 or $2.00 per pound." *See id.*

After receiving the goods in St. Laurent, Airoute brought the shipment to its facility in Dorval, Quebec and, on the same day, tendered the shipment to its subcontractor, Paquin, Inc. ("Paquin"), also located in Quebec. *See* St. Facts ¶¶ 9, 17. Airoute had hired Paquin, a Canadian transport company, to truck the shipment from Quebec to Pennsylvania. *See id.* ¶ 17.

Before delivery to Pennsylvania, Airoute expected Paquin to store the shipment inside Paquin's warehouse over the weekend.[2] *See id.* ¶ 18. However, on the weekend of November 15–16, 1997, Paquin did not store Ingram Micro's shipment inside its warehouse, but instead, kept the shipment in a trailor outside its warehouse. *See id.* ¶¶ 22, 23. At some time during this weekend, the shipment disappeared from Paquin's facility. *See id.* ¶ 24. Other than a guard shack at the entrance to Paquin's facility, there was no apparent security system in place outside of Paquin's warehouse. *See id.* ¶ 25.

Thereafter, Canadian law enforcement personnel recovered 205 boxes of the 549 boxes of Corel software, and recovered 1033 boxes of the 2550 boxes of the Corel upgrade software. *See id.* ¶ 26. In 1998, Paquin, acting as Airoute's subcontractor, delivered the recovered boxes in good order and condition to Ingram Micro's warehouse in Harrisburg, Pennsylvania. *See id.* ¶ 27. The remaining 344 boxes of Corel software and 1,517 boxes of Corel upgrade software were never recovered and never delivered to Ingram Micro in Harrisburg, Pennsylvania. *See id.* ¶ 28.

Ingram Micro's damages for the loss to

---

**2.** For two years prior to November 13, 1997, Paquin had held a number of shipments for Airoute over weekends, including other shipments of Corel software to Ingram Micro. *See* St. Facts ¶¶ 20, 36. On each of these occasions, Airoute expected and believed that Paquin would store the shipments under lock and key inside Paquin's warehouse. *See id.* ¶ 21.

the shipment amount to $434,894.00.[3] *See id.* ¶ 31. The shipment was insured by Chubb under an ocean marine cargo insurance policy. *See id.* ¶ 32. Ingram Micro made a claim upon the cargo policy, and Chubb paid Ingram Micro $384,894.00 for the loss to the shipment. *See id.* ¶ 33. The entire shipment weighed 26,651.41 pounds. *See id.* ¶ 34. The non-delivered portion of the shipment weighed 17,739.32 pounds. *See id.*

## II. DISCUSSION

### A. Federal Common Law

Ingram Micro claims that United States federal common law governs its claim against Airoute. *See* Plaintiff's Post–Trial Memorandum of Law ("Pl.Mem.") at 9. Airoute claims that Canadian law should apply. *See* Airoute's Trial Memorandum of Law ("Def.Mem.") at 3. Before addressing the choice of law question, the threshold question is whether federal common law may be applied to this action at all. While Ingram Micro argues in favor of applying federal common law rather than Canadian law, it does not explain why federal common law should apply rather than the laws of New York, California or Pennsylvania.[4]

■ Within constitutional limits, federal preemption of state law is found where Congress has explicitly expressed its intent to preempt, or where the nature and object of the federal laws and regulatory scheme show Congress' intent to oc-

cupy the entire field. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Campbell v. Hussey,* 368 U.S. 297, 303, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961). In cases involving common carriers, where the Interstate Commerce Commission ("I.C.C.") has exercised its authority to regulate, state statutes, regulations, and common law are preempted insofar as they conflict with the federal regulation. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

■ The instant case involves a transport of goods from an adjacent foreign country to the United States by ground, an area not regulated by the I.C.C. Plaintiffs in other cases have tried to bring such cases under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707. That Amendment governs cases where: "the actual loss or injury to the property [is] caused by (1) the receiving carrier, (2) the delivery carrier, or (3) another carrier over whose line or route the property is transported in the United States or *from* a place in the United States *to* a place in an *adjacent foreign country* when transported under a through bill of lading." 49 U.S.C. § 11706 (emphasis added). Here, the goods were transported from an adjacent foreign country, namely Canada, into the United States. Because the Carmack Amendment is limited to transport of goods by ground between

---

**3.** Each box of the Corel software had a sound market value of $382.25. *See* St. Facts ¶ 29. The sound market value of the 344 non-delivered boxes of Corel software totals $131,494.00. *See id.* Each box of Corel upgrade software had a sound market value of $200.00. *See id.* ¶ 30. The sound market value of the 1,517 non-delivered boxes of Corel upgrade software totals $303,400.00. *See id.* Thus, the total value of the non-delivered software is $434,894.00.

**4.** Airoute claims that this Court should choose between the laws of six jurisdictions: Canada, California, Pennsylvania, New York, Belgium or England, preferably Canada. *See* Airoute's Reply Memorandum of Law ("Reply Mem.") at 1. Airoute, however, does not address the central question of whether federal common law preempts state regulation. *See id.* at 1–4; *see also* Def. Mem. at 1–12.

states and from the United States into a foreign country, by its terms, the Amendment does not apply to this action. *See Whaling v. Atlas Van Lines, Inc.*, 919 F.Supp. 168, 170 (E.D.Pa.1996); *Kenny's Auto Parts, Inc. v. Baker*, 478 F.Supp. 461, 464 (E.D.Pa.1979) ("The cases interpreting the Carmack Amendment have uniformly held that the Carmack Amendment has no application to goods received for shipment at a point outside the United States.").

Clearly, the Warsaw Convention, 49 U.S.C. § 40105, which governs the international transport of goods by air, and the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5), which governs the transport of goods by sea, also do not apply here as this was a shipment by truck, not by air.

■ The weight of authority reveals that federal common law applies to the interstate transport of goods by air. *See, e.g., Williams Dental Co. v. Air Express Int'l*, 824 F.Supp. 435, 441 (S.D.N.Y.1993), *aff'd mem.*, 17 F.3d 392 (2d Cir.1993); *Welliver v. Federal Express Corp.*, 737 F.Supp. 205, 207 (S.D.N.Y.1990); *United States Gold Corp. v. Federal Express Corp.*, 719 F.Supp. 1217, 1224–25 (S.D.N.Y. 1989). The question remains as to whether federal common law can also be applied to a shipment from an adjacent foreign country to the United States by ground.

■ As the preceding discussion reveals, most forms of interstate transportation are governed by federal law that has entirely preempted state regulation of common carriers. *See Adams Express Co. v. Croninger*, 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913). Federal common law has also been held to cover contracts for air carriage that fall within the gap left between the Warsaw Convention and interstate carriage. *See Zicherman v. Kore-*

*an Air Lines Co.*, 516 U.S. 217, 229, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (holding that federal common law is "the law that would govern in the absence of the Warsaw Convention"); *see also Hitachi Data Sys. Corp. v. Nippon Cargo Airlines Co.*, No. C–93–2456, 1995 WL 16923, at *3 (N.D.Cal. Jan. 6, 1995) (same). Moreover, courts have held that federal common law is properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute, but the use of common law will fill gaps in the congressional statutory pattern. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973); *Quasar Co. v. Atchison, Topeka and Santa Fe Ry. Co.*, 632 F.Supp. 1106, 1112 (N.D.Ill.1986). In sum, common law principles have long been used to fill gaps in or supplement the Interstate Commerce Act. Therefore, federal common law may be applied to this carriage of goods, rather than the laws of any of the relevant states.

### B. Choice of Law

The next question is whether to apply federal common law or Canadian law. Ingram Micro argues that federal common law should apply, and that, under federal common law, the limitation of liability on the bill of lading is neither valid nor enforceable. *See* Pl. Mem. at 15, 20–21. Airoute argues that Canadian law should apply, and that, under Canadian law, the limitation of liability is enforceable. *See* Def. Mem. at 3, 9.

#### 1. New York's Choice of Law Rules

■ A federal court sitting in diversity [5] must apply the choice of law rules of the

---

5. This Court has diversity jurisdiction over the subject matter of this case pursuant to 28

U.S.C. § 1332 in that this action is between a citizen of a State and citizens of a foreign

forum state, in this case New York. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *White v. ABCO Eng'r Corp.*, 221 F.3d 293, 301 (2d Cir.2000). Historically, New York courts faced with a choice of law question in contract cases employed a traditional, "territorially oriented" approach, applying the law of the geographical location where the contract was made or was to be performed. *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 581 N.E.2d 1042 (1991); *see also* Restatement, Conflict of Laws § 370 (1934). However, as the mechanical application of these rigid rules proved unsatisfactory, the New York Court of Appeals developed a more flexible approach to choice of law questions. *See Zurich Ins. Co., v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994); *Auten v. Auten*, 308 N.Y. 155, 160–61, 124 N.E.2d 99 (1954).

 In contract cases, New York courts now apply a "center of gravity" or "grouping of contacts" approach to choice of law questions. *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030–31 (2d Cir.1996). The purpose of this approach is to establish which state has the "most significant relationship to the transaction and the parties" and to apply the laws of that state. Restatement (Second) of Conflict of Laws ("Restatement") § 188[1] (1969). Under the "grouping of contacts" approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *See In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 613

N.E.2d 936 (1993); *see also* Restatement § 188[2]. New York courts may also consider public policy interests "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *In re Allstate*, 81 N.Y.2d at 226, 597 N.Y.S.2d 904, 613 N.E.2d 936. The traditional choice of law factors, the places of contracting and performance, should be given the heaviest weight in a grouping of contacts analysis. *See id.*

### 2. Application

██ A cursory application of New York's "grouping of contacts" test to this action does not reveal a clear winner as to the jurisdiction that has the "most significant relationship to the transaction and the parties". Restatement § 188[1]. However, a careful consideration of the "spectrum of significant contacts" shows that the United States has the most significant relationship to this action.

#### a. Place of Contracting

Ingram Micro argues that the United States is the place of contracting because the contract was entered into when Ingram Micro transmitted its acceptance of Airoute's terms from California to Canada on November 12, 1997. *See* Pl. Mem. at 17. Airoute claims that the place of contracting is Canada because the controlling bill of lading between the parties was Airoute's Canadian bill of lading, which was issued in Quebec on November 13, 1997. *See* Def. Mem. at 3.

The true place of contracting is California. Although the terms of the contract were sent from Canada, the contract was not fully executed until Ingram Micro

state, and the amount in controversy exceeds the sum or value of $75,000 exclusive of inter-

est and costs.

transmitted its acceptance from California. *See* 2 Williston, Contracts § 6:1 (4th ed. 1990) ("An acceptance ... is necessary to create ... a contract ...."); *id.* § 6:34 ("[T]he place of contracting will ... be ... that place where the acceptor ... communicates, or otherwise transmits [its] acceptance."); *see also Windsor Indus., Inc. v. EACA Int'l, Ltd.*, 548 F.Supp. 635, 638 (E.D.N.Y.1982) (finding that Hong Kong law applied when acceptance of the contract occurred in Hong Kong). Thus, the contract had already been formed in California when the bill of lading was issued in Canada.

### b. Places of Negotiation and Performance

The place of negotiation favors neither party in that the contract was negotiated between California and Canada. The place of performance, however, is disputed. Ingram Micro argues that the United States is the place of performance because the delivery was to be made in Pennsylvania and the majority of the travel time was to be within the United States. *See* Pl. Mem. at 17. Airoute argues that the place of performance is Canada because the goods were stored in and disappeared from Canada. *See* Def. Mem. at 4.

This Court concludes that the predominant place of performance is the United States. Both parties understood that delivery was to be made in Pennsylvania and that the software was to be distributed through Ingram Micro's facilities there. Moreover, the only portion of the contract to be performed in Canada was Airoute's receipt and storage of the cargo and the short drive to the New York border. The disappearance of the goods from Canada is irrelevant to the determination of the planned place of performance. As Ingram Micro correctly asserts, the greater portion of the performance was to be in the United States, including the significantly longer travel time and the delivery of the goods.

### c. Location of the Subject Matter

Ingram Micro argues that this factor favors neither party in that the parties contemplated the goods moving from Canada to the United States. *See* Pl. Mem. at 18. Airoute claims that this factor favors Canadian law because the goods never left Quebec. *See* Def. Mem. at 4.

This Court concludes that the location of the subject matter was to be in Canada and the United States, favoring neither party. The unexpected loss of the goods from Canada should not be determinative in this analysis. Although the shipment was located at all times in Canada from where it disappeared, the fact that the shipment failed to enter the United States as planned should not preclude the United States from having a significant interest in this dispute.

### d. Domicile or Place of Business of the Parties

This factor favors neither party. Ingram Micro is incorporated in Delaware and has its principal place of business in California. Airoute is incorporated and has its principal place of business in Canada.

### e. Conclusion

The "grouping of contacts" analysis requires the application of federal common law to this controversy. The place of contracting and place of performance, which are given the heaviest weight in this analysis, favor United States law over Canadian law. The other factors do not weigh in favor of either party. Here, Ingram Micro placed an order and made shipping arrangements from California and expected delivery in Pennsylvania. The economic harm Ingram Micro suffered from the loss to its shipment is of local interest to the

United States which has an interest in evaluating that harm.

## C. Airoute's Liability under Federal Common Law

The final questions are whether, under federal common law: (1) Airoute is liable for the loss to the shipment; and (2) Airoute's liability is limited.

### 1. Airoute's Liability

To establish a prima facie case of non-delivery under federal common law, Ingram Micro must show that Airoute received the shipment in good order and condition, that Airoute failed to deliver the shipment to Pennsylvania, and that Ingram Micro incurred damages. *See Missouri Pac. R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). The burden of proof then shifts to Airoute to show that it was free from negligence and that the non-delivery was due to an exceptional circumstance. *See id.; see also Shippers Nat'l Freight Claim Council, Inc. v. ICC,* 712 F.2d 740, 745 (2d Cir.1983) (holding that, under federal common law, a common carrier is liable for the full extent of the loss to goods it transports unless the loss was caused by particular exceptional circumstances). There are five such exceptional circumstances: (1) an act of God; (2) an act of a public enemy; (3) an act of the shipper; (4) an act of a public authority; and (5) inherent vice or nature of the goods. *See Missouri Pac.,* 377 U.S. at 137, 84 S.Ct. 1142.

The undisputed facts show that Airoute received the shipment in good order and condition. *See* St. Facts ¶ 16. It is also undisputed that Airoute failed to deliver the shipment to Pennsylvania and

that Ingram Micro suffered damages in the amount of $434,894.00. *See id.* ¶¶ 28, 31. Moreover, Airoute failed to show that it was free from negligence and that the loss to the shipment resulted from an exceptional circumstance.[6] Thus, Airoute is liable for the loss to the shipment.

### 2. Airoute's Limitation of Liability

The remaining question is whether, under federal common law, the limitation of liability on Airoute's bill of lading is enforceable.

Courts generally refuse to enforce agreements between carrier and shipper that purport to relieve the carrier from liability for loss of property caused by the negligence of the carrier or its servants. *See Shippers,* 712 F.2d at 746. However, a carrier may limit its liability by satisfying two prerequisites. *First,* the limitation of liability must be the result of a "fair, open, just, and reasonable agreement" between carrier and shipper, entered into by the shipper "for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." *Adams Express,* 226 U.S. at 509–510, 33 S.Ct. 148. *Second,* the carrier must give the shipper "the option of higher recovery upon paying a higher rate." *Boston & Maine R.R. v. Piper,* 246 U.S. 439, 444, 38 S.Ct. 354, 62 L.Ed. 820 (1918). In determining whether these requirements for enforceability are satisfied, courts consider such factors as (1) whether the carrier has given adequate notice of the limitation of its liability to the shipper, (2) the economic stature and commercial sophistication of the parties, and (3) the availability of "spot" insurance to cover a shipper's exposure. *See Williams Dental,* 824 F.Supp. at 441; *United States Gold,* 719 F.Supp. at 1224–25.

---

6. Paquin's failure to store Ingram Micro's shipment with the proper security measures constitutes negligence, for which Airoute is vicariously liable.

Ingram Micro argues that the limitation of liability should not limit its recovery against Airoute because Airoute has failed to satisfy the two prerequisites for an enforceable limitation of liability. *See* Pl. Mem. at 21. Specifically, as to the first prerequisite, Ingram Micro claims that the limitation of liability was not obtained by Airoute or agreed to by Ingram Micro as the result of a "fair, open, just and reasonable agreement[.]" *Id.* (quoting *Shippers,* 712 F.2d at 746).

■■■■ The policy behind requiring a fair and open agreement as to limitations of liability is to ensure that the shipper has notice of the limitation prior to contracting with the carrier and that the carrier is aware of the extent of its liability. *See Shippers,* 712 F.2d at 746; *Read–Rite Corp. v. Burlington Air Express, Ltd.,* 186 F.3d 1190, 1198 (9th Cir.1999). There is little doubt that Ingram Micro was aware of Airoute's limitation of liability, even though it did not expressly agree to the limitation. Ingram Micro had contracted with Airoute for similar shipments of Corel software to the United States for approximately two years prior to the November 12, 1997 incident. *See* St. Facts ¶ 36; *see also United States Gold,* 719 F.Supp. at 1225 (finding that plaintiff's prior course of dealing with Federal Express demonstrated that plaintiff had adequate notice of Federal Express's limitation of liability). In addition, Airoute's bill of lading appears to be a standard form used to cover all of its contracts of carriage. *See Hitachi Data Sys. Corp. v. Nippon Cargo Airlines Co.,* No. C–93–2456, 1995 WL 16923, at *4 (N.D.Cal. Jan. 6, 1995) (finding an implicit agreement to a limitation of liability where the parties had an established business relationship and there was no evidence of an unusual waybill).

Moreover, Ingram Micro's purchase of separate insurance from Chubb demon-strates that Ingram Micro was on notice and understood the limitation of liability. *See* St. Facts ¶ 32. Under federal common law, "the function served by notice of limited liability is accomplished if the shipper in fact purchases separate insurance, whether or not such notice is actually given." *Read–Rite,* 186 F.3d at 1198; *see also Vision Air Flight Serv. v. M/V Nat'l Pride,* 155 F.3d 1165, 1169 (9th Cir.1998) (finding that the decision to insure separately "in and of itself demonstrates ... a conscious decision not to opt out of the liability limitation"). In failing to declare a value for its shipment, Ingram Micro made a deliberate choice to forego the additional cost it would have incurred to increase Airoute's liability. As recently explained by the Ninth Circuit, "[w]hy would [the shipper] increase its costs by insuring the same cargo twice?" *Travelers Indem. Co. v. The Vessel Sam Houston,* 26 F.3d 895, 900 (9th Cir.1994).

As to the second prerequisite, Ingram Micro contends that Airoute insisted on a non-negotiable limited liability freight rate as a result of which it was not permitted to declare the value of the shipment and pay a premium for increased liability by Airoute. *See* Pl. Mem. at 21; *see also* St. Facts ¶¶ 6,7.

Ingram Micro's assertion is not credible given its status as a sophisticated shipper of goods. The more likely scenario is that Ingram Micro chose not to declare a value for its shipment, and in doing so relinquished the opportunity to obtain greater coverage from Airoute. If Ingram Micro had desired greater coverage from Airoute, it could have contracted for it. *See United States Gold,* 719 F.Supp. at 1225 (holding that a court may consider the economic stature and commercial sophistication of the parties in determining the enforceability of a limitation of liability). Indeed, Airoute asserts that if Ingram Mi-

cro had declared a value for its shipment, Airoute would have secured insurance and included the premium in its charge to Ingram Micro. *See* Reply Mem. at 2.

██ In sum, Airoute's limitation of liability on its bill of lading is enforceable. Ingram Micro was on notice and implicitly agreed to Airoute's limitation of liability. Because Ingram Micro had equal if not more bargaining power than Airoute, it could have declared a higher value and paid the premium for increased protection. "Public policy considerations of fair dealing and predictability in commerce" favor enforcing the limitation of liability between Ingram Micro and Airoute. *Hitachi*, 1995 WL 16923, at *4.

Accordingly, Ingram Micro is entitled to the "lesser of $100.00 or $2.00 per pound." *See* Airoute's BOL ¶ A. The non-delivered portion of the shipment weighed 17,739.32 pounds. *See id.* ¶ 34. Thus, Ingram Micro is entitled to Canadian $100.00.

## III. CONCLUSIONS OF LAW

1. The law applicable to this action is federal common law.

2. Under federal common law, Airoute is liable for the loss to Ingram Micro's shipment.

3. The limitation of liability on Airoute's bill of lading is enforceable.

4. Ingram Micro is entitled to judgment against Airoute in the sum of Canadian $100.00 plus interest from November 20, 1997.

The Clerk of the Court is directed to prepare a judgment in accordance with this Opinion and close this case.